Robert E. Dickeson, Plaintiff-Appellee, v. Baltimore & Ohio Chicago Terminal R. R. Co., a Corp., et al., Defendants-Appellants.

Gen. No. 49,363.

First District, Second Division.

March 30, 1965.

Rehearing denied September 27, 1966.

John H. Gobel and N. E. Liontakis, of Chicago, for appellants.

Philip H. Corboy and James P. Chapman, of Chicago (James P. Chapman, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court:

This appeal comes from a judgment entered on a jury verdict finding the appellant railroads guilty of negligence and assessing the appellee's damages at $116,480. The appellants deny negligence on their part and claim also that the appellee was guilty of contributory negligence as a matter of law. To these claims are added several errors alleged to have taken place at the trial.

The appellee here was the plaintiff in a personal injury action below. The appellants are the Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Company, the owners of the right-of-way on which the appellee was injured; the Pennsylvania Railroad Company, the lessee of that right-of-way; and the Baltimore and Ohio Chicago Terminal Railroad Company, the user of this right-of-way by agreement with the Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Company.

Most facts concerning this accident are not in dispute. The appellee, Robert Dickeson, was 14 years and four days old at the time of the occurrence. He was born and raised in Drakesboro, Kentucky and lived in close proximity to a railroad track which ran through the town. Before the accident, appellee's health was excellent except for a condition of the eyes known as internal strabismus—that is to say in layman's language he was cross-eyed. As a result he tended to see everything out of his right eye. When he looked straight ahead he saw objects to his left with hazy vision.

While in Kentucky, Robert attended the Drakesboro Consolidated School which combined both grade

12

school and high school. He had failed one year of school in Kentucky and when he began school in Chicago he was placed in the sixth grade. His younger brother, David, though two and one-half years junior to the appellee, was put in the fifth grade.

In November or December of 1952, appellee's family moved to Chicago and resided at 338 South Artesian Avenue. Appellee attended the King Elementary School which was located near his home. His school record shows he attended that school for two and three-tenths weeks before his accident. He never returned to school after he incurred the injuries of which he complains here.

The father of the appellee testified that he had warned Robert once when he was six or seven years old not to play on the railroad tracks which ran behind their home in Drakesboro. This was confirmed by the appellee. There is no other evidence of warnings being given Robert concerning the danger of playing on or near railroad trains. The testimony is uncontroverted that the appellee had never ridden a railroad train in his life nor that he ever had attempted to hitch or "flip" a ride on a train before the date of the accident.

The accident occurred when the appellee and his brother were returning home from visiting their sister late in the afternoon of January 22, 1963. They had been playing tag, but when they passed the railroad embankment they decided it would be fun to go up there. Both testified that neither had been up there before; both testified that they had seen other children playing on the embankment before the accident. They climbed the embankment using a path that had been worn there, apparently from the constant use of children going up to the tracks to play. The path ran from the top of the embankment to Rockwell Street to the east and took the plaintiff and his brother to a

13

point about 150 feet north of an overpass which carried the tracks over Jackson Boulevard.

The testimony is that the boys were standing on this embankment when a slowly moving Baltimore and Ohio train approached from the north on the second track from the east. Thus, the boys were on the eastern most track while the train was on the track next to them. The train was headed toward the overpass crossing Jackson Boulevard. There was testimony that the appellee and his brother waved to the engineer and that he waved back. There was no testimony that anybody tried to chase these boys off the embankment. As the train was passing by, Robert grabbed a ladder rung which was affixed to the side of a car and began to climb up the rungs to the top. He testified that as he was doing so he looked upward, obviously looking to see where the next rung on the ladder was. It should be noted that as he was climbing the ladder his left side was toward the south—the direction in which the train was moving. As noted before, Robert had bad vision to the left due to a condition of the eyes. As the train passed over Jackson Boulevard, appellee was knocked off the side of the car by a bridge girder.

A switchman on the train heard the appellee cry out as he was hit, and pulled the emergency cord to stop the train. Robert was found wedged between the train and the girder of the overpass. The police were summoned and appellee was removed to Cook County Hospital. It is not necessary to discuss the injuries incurred by the appellee here; no point is being made here as to the extent of these injuries, nor is there any claim that the damages as assessed by the jury are excessive.

The situs of the accident was a railroad embankment, or elevated right-of-way, located in a densely populated area. The neighborhood was a blighted one

with no easily accessible playgrounds for the young people. The only playground in the immediate area was part of a housing project and was restricted to the use of the children of the tenants.

On this right-of-way were located five tracks, which had been elevated in 1897. As originally built, there was a retaining wall on the Rockwell Street side of the embankment (the side from which the appellee climbed to the tracks), but in later years the wall was allowed to fall into disrepair, and gradually an incline developed allowing easy access to the right-of-way.

No claim is made here that the fact that there was not a wall or fence barring access to the tracks is violative of any statute. It is, however, maintained by the appellee that under the circumstances, it was negligent for the appellant railroads not to fence off their right-of-way or find some other method to keep the children from harm.

There was evidence adduced at the trial that it was customary for neighborhood children to play on the tracks and that often they would flip rides on the slow moving freight trains as they went by, ride them a short while and jump off a few blocks from the point of beginning. When a freight was moving the other way, the same procedure would be repeated, returning the children back to where they started. There was evidence that this practice had been going on for a great number of years. There was also evidence that the presence of the children was known to the railroads involved in this case. Testimony was given to the effect that children used to throw rocks at the trains as they went by, and railroad employees acknowledged that they had seen children on the tracks and that it was known that they would try to hitch rides on the trains. A policeman testified he saw children on the embankment about once a week and

15

that he saw children at the station house about six times a week when they had been brought in by others for playing on the tracks. He testified that the children ranged in age from six to sixteen years. He also testified that he had conversations with the B & O about the problem of children playing on the tracks. In addition, several residents of the neighborhood took the stand to testify that the children of the area habitually played on that embankment and that they had seen children flip the trains.

Records of the Pennsylvania Railroad Company were subpoenaed and showed that four other children within three years preceding this accident had been injured by moving trains while on the embankment, in the immediate vicinity of the spot where this accident occurred.

The sum of the arguments concerning liability in this case is the claim of the appellee that the railroads were put on notice that children were in the custom of playing on the tracks and that it was negligent of the railroads in question not to construct some sort of barrier to keep them off the right-of-way, or have a more vigilant lookout maintained by railroad personnel for these children. The railroads maintain that they were under no duty to fence. They insist that whatever might be the argument for fencing this area, it could be made for any section of track in the city, pointing out that fencing in all the railroad track in the city would impose an undue burden on the railroads. The appellant railroads also claim that the appellee was guilty of contributory negligence as a matter of law.

Any determination of negligence on the part of the appellant railroads must take into account the doctrine of Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836 (1955). That case has been cited and discussed so much that its facts hardly bear repetition here.

16

The holding of that case is summed up in the following paragraph taken from page 625 of the official reporter, pages 841, 842 of the Northeastern Reporter:

"It is generally true, as defendant contends, that an owner or one in possession and control of premises is under no duty to keep them in any particular state or condition to promote the safety of trespassers or others who come upon them without any invitation, either express or implied. (citations omitted) It is also established that infants, as a general rule, have no greater rights to go upon the land of others than adults, and that their minority of itself imposes no duty upon the occupier of land to expect them or prepare for their safety. (citations omitted) It is recognized, however, that an exception exists where the owner or person in possession knows, or should know that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (citation omitted) The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child."

The court went on to say that the question of whether a condition or agency was sufficiently attractive to

17

entice children, whether the condition would involve danger to the children, and whether the condition was such as to give notice to the owner or occupier of the premises that children were likely to trespass was a question of fact for the jury to determine.

In the case before us there was evidence that the railroads did in fact know that children were in the habit of trespassing on the embankment. A moving railroad train is certainly an instrumentality of great potential danger to children, and the jury was certainly within its province to decide that such trains are sufficiently attractive to entice children to climb on them.

The appellants, however, insist that the Kahn doctrine is not applicable to this case. They urge that the Kahn doctrine leaves the old attractive nuisance doctrine intact, changing only the requirement that the child must have been lured onto the premises by the instrumentality which caused injury. From this they argue that the appellee was still guilty of contributory negligence, and urge that the requirement of the Kahn case that the cost of remedying the situation be slight as compared to the dangers involved prevents the application of this doctrine to them.

The question of contributory negligence is one for the jury to decide. While a child under the age of 14 years is presumed free of contributory negligence, the jury may find that a child of 14 years or older is free from contributory negligence in any given instance. "It is firmly established that in determining the question of due care the factors of experience, intelligence and capacity must be considered in the case of a minor over 14 years of age." Skaggs v. Junis, 27 Ill App2d 251, 169 NE2d 684 (1960).

The appellant railroads insist that as a matter of law children of the age of the appellee must recog-

nize the danger involved in playing on moving trains. This is not true. They have cited several cases which, they say, supports their proposition. While no attempt will be made to discuss all of them, the most recent merit some consideration. Petermichl v. Chicago & N. W. Ry. Co., 205 F2d 434 (7th Cir, 1953) involved a grown man who attempted to jump on a moving commuter train while holding a leather bag and a large envelope in his right hand—the plaintiff being right handed. This plaintiff had been using this station for 13 years, and the court held that as a matter of law he must be held to have recognized the dangers involved in his act. This is far different from a 14-year-old boy who had never been on a train in his life.

Maskaliunas v. Chicago & W. I. R. Co., 318 Ill 142, 149 NE 23 (1925) dealt with a child 7 years and 10 months old. In that case the railroad company was found guilty of negligence in allowing its right-of-way to be used by children for a play area. The case contains the dictum that when a child reaches the age of 14 he is held to the same degree of care as an adult, but consideration must be made for age and experience. This hardly supports the appellants' contention that 14 year olds are held to be contributorily negligent as a matter of law when flipping a train.

Matijevich v. Dolese and Shepard Co., 261 Ill App 498 (1931) dealt with a child who was injured when on a dare he allowed a dynamite cap to explode in his hand. The holding of the case was that since the boy was not lured onto the land by the dynamite caps, but had gone there to go hunting, he did not fall under the attractive nuisance doctrine. The court also said in dictum that since the evidence showed the boy had exploded several of the caps before he was injured and that he fully appreciated the concussive pow-

er released by the explosions, he was not exercising due care in allowing one to explode in his hand. To state the facts is to distinguish that case from the one at bar.

Gemmill v. Grand Trunk Western Ry. Co., 211 Ill App 246 (1918) was a case which held that a 12-year-old boy who was killed while trying to jump on a moving train was guilty of contributory negligence as a matter of law. This case is certainly appellants' strongest, but we feel it is no longer valid law in this state. Even the appellants concede that if the appellee here were under 14 years of age his contributory negligence would be a question for the jury.

■■ The jury was instructed that a minor is not held to the same standard of conduct as an adult, and that the jury was to evaluate the question of appellee's due care for his own safety in view of what would be expected of a reasonably careful minor of similar age, *mental capacity* and experience. (Emphasis supplied.) The appellant railroads made no claim that this instruction misrepresents the law of this State. We find no error in this matter.

■ Addressing himself to the question of mental capacity, the appellee brought in testimony from a psychologist, Mr. George Speer, to the effect that Robert was of less than average intelligence. He testified that appellee had an I. Q. of 81 which classified him as "dull-normal." An average score would be from 90 to 110. This psychologist stated that he gave Robert three tests, described as objective, each of which was recognized in the profession. According to this witness the three tests were given so that there might be a cross-check to insure the accuracy of the results. As a result of these three examinations, this witness testified that he could say with a reasonable degree of certainty that the appellee was doing the best he could.

The appellants take strong exception to the admission of these tests on the grounds that the appellee might have purposely given the wrong answers. They point out that the lower the appellee scored on these tests, the better was his chance of being found free from contributory negligence. While all they say is true, we cannot agree with them that this evidence should have been excluded. Obviously a test like this cannot produce a result which can be said to be absolutely certain. As appellants point out, there may be cultural biases in these examinations, the examinee may be trying to do poorly, the examiner might not be giving the test well; but this can be said of any psychological or psychiatric examination.

In the case of Hidden v. Mutual Life Ins. Co. of New York, 217 F2d 818, it was held reversible error for a trial judge to refuse to admit testimony of a psychologist. In that case the testimony was to go to the issue of whether or not the plaintiff had a nervous condition which he claimed kept him from working. He had the same motives for doing poorly on the examinations as the appellee did here. Yet it is clear in these cases that while these tests are not scientifically accurate in the sense of physics or mathematics, they must be admitted if the court is to take cognizance of psychological factors. Until someone devises a better way of testing I. Q. or whether a man knows right from wrong or any of the other things for which these tests can be used, we shall have to make do with these. The courts decided long ago that this evidence is accurate enough to be admissible. Any question concerning the exactness of these tests is a problem for the jury in determining what weight they should be given. Appellants' cross-examination fully brought out the problems involved in giving and evaluating these examinations. The jury was fairly

informed concerning these tests and we can find no error whatsoever in permitting these examinations to come in.

■ The next question presented goes to the existence of negligence on the part of the railroads. It is clear that railroads do not have to go out of business because children might be injured while trespassing on their land. We considered this problem recently in American National Bank v. Pennsylvania R. Co., 52 Ill App2d 406, 202 NE2d 79 (1964). In that case a child was injured on the exact same stretch of track that was involved in this case. That case was, however, decided in part on the basis of fencing ordinances; in the case at bar appellee pled these ordinances as part of his complaint, but the court below struck them as being no longer in effect. No cross-error has been assigned as to the correctness of that ruling. As far as this appeal is concerned, the issue is out of the case.

■ Can it be said that the railroads breach a common law duty by not taking steps to keep the children of the neighborhood off the right-of-way? Assuming, as we must in this appeal, that there were no statutory or regulatory requirements that the railroads fence, we feel that under the circumstances the appellants had a common law duty to take steps to close their right-of-way to the children. The fact that there was no statute or regulation requiring them to fence generally does not mean that under certain circumstances the duties imposed on owners and users of land by the Kahn opinion will have no effect. In the Kahn case itself, there was no violation of a statute or regulation of any kind, yet the Supreme Court held a duty existed because the instrumentality or condition on the land was potentially dangerous and the owner or user of the land had notice that children might well come to injury because of it. So in this case, the trains are dangerous to children playing on or by them, and

the appellants had knowledge that the children were customarily there. We hold, therefore, that there was a common law duty on the railroads to take steps to keep these youngsters off the right-of-way.

The appellants insist that this will place an impossible burden on them. We quote from their brief:

> "The allegations and evidence concerning this aspect of the case boil down to the question of fencing. There was evidence that railroad police and city police patrolled the area regularly and apprehended persons engaged in illegal or dangerous acts. There was no evidence as to the possibility of removing the elevation fill. The only evidence with reference to the 'utility' requirement was that the cost of fencing railroad right-of-way at the time of the accident was $4.16 per linear foot, or a cost of $21,964.80 per mile for one side of the right-of-way. This amounts to a cost of $43,929.60 per mile to fence both sides of the right-of-way for only one mile. The length of the City of Chicago is about 25 miles, so to fence one railroad for the length of its right-of-way through the City of Chicago would come to a cost of over $1,000,000.00."

They say that to fence all the railroad right-of-way in the State of Illinois would cost $486,000,000. They conclude, "Certainly it should not be said that the railroads must assume this crushing burden, in addition to the other financial burdens under which they admittedly are laboring today."

Certainly not, but no one is suggesting that the railroads fence in their entire right-of-way. In this case we are dealing with a situation where children *habitually* were on the tracks. This was a congested area with few recreational facilities. There was testimony that children were there every day. It is cer-

23

tainly clear that they were there many times each week. We also have a situation where the trains were moving slowly enough that children could flip the cars as they went by. This creates a situation where the slow moving trains might well appear safe to a child, where that same child would be aware of the dangers of a fast moving train. There is no evidence before us that this is the standard situation in this city or in this state. It may well be that the same problem exists in some other parts of the city or the state. But trains do not ordinarily move that slowly, and tracks do not ordinarily run through such congested areas, and rights-of-way do not ordinarily have such a history of accidents as did this stretch of track. The appellants in this case were negligent in not taking some precautions, be it fencing or otherwise, to free their right-of-way of these children.

The appellants next claim that one of the requirements of the Kahn case is that the condition or instrumentality on the land be such that children because of their immaturity would not comprehend the nature of the risk involved. They continue by asserting that children, by law, recognize the danger presented by a moving train. This point is made in the section of their brief dealing with contributory negligence. We cannot see what new issue it raises. If what is meant is that a child of the appellee's age must recognize the danger incumbent on flipping a train, then it is a question of contributory negligence and for the jury to decide. If they are trying to say that the railroads never had notice that the children would be attracted to the trains, the evidence is quite to the contrary, and the jury so found.

██ ██ We hold, therefore, that the finding of the jury that the appellants were negligent and that the appellee was free from contributory negligence was

not against the manifest weight of the evidence, or contrary to the law.

A claim is made that the Baltimore and Ohio was not subject to the Kahn rule because it did not own the right-of-way, but only used the tracks which were owned by the Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Company and leased to the Pennsylvania Railroad Company. The jury was instructed without objection from the appellee that the Baltimore and Ohio did not have a duty to build any fences. This does not, however, mean that the Baltimore and Ohio was necessarily free from negligence. The jury found this appellant guilty on the basis that it negligently operated its train. The instructions are very clear that this was the only way they could find against that railroad. We cannot say that such a finding would be manifestly against the weight of the evidence. The testimony was that the switchman was in the caboose, that from the cupola of the caboose one could look out and see whether children were on the tracks. It is also clear from the evidence that the cupola was boarded up in the winter to keep the cold air out, necessarily blocking the view of anyone inside. The switchman, therefore, was not keeping a lookout for children, yet he said at the trial that he knew they were in the habit of playing on the tracks. The engineer of the train waved to the appellee and his brother as he went by; no gesture was made by him to indicate that they should not be there. Whether or not someone should have been keeping a sharper lookout, or whether the engineer's waving to the children could have been interpreted by them as meaning that their presence on the right-of-way was not improper was a question for the jury to decide. We see nothing that could justify our substituting our judgment for theirs.

The appellants next claim that they were unreasonably restricted in their cross-examination aimed at ascertaining whether the appellee knew the dangers of moving railroad trains. They sought to determine whether the railroad tracks which ran through Drakesboro, Kentucky were fenced or unfenced. The question was not allowed and the attorneys for the appellants were instructed by the court below not to inquire into the matter. It has long been the law that the scope of cross-examination lies largely within the sound discretion of the trial judge, and unless that discretion is clearly abused, with resulting prejudice to a party, we should not on appeal interfere with such a ruling. Hinnerichs v. Galbraith, 40 Ill App 2d 433, 189 NE2d 760 (1963). We cannot say that the trial judge abused his discretion in refusing to permit the appellants to inquire as to the condition of the tracks in Drakesboro. Assuming the tracks were unfenced, the appellants would still have to show that the trains were moving slowly enough to attract children to play on them. No such offer of proof was made. As we noted above, there might be a great deal of difference in the attractiveness of a train moving five miles per hour and one moving sixty-five miles per hour. Unless there were groundwork laid to establish a similarity between the conditions under which the trains ran in Drakesboro and the manner in which they were operated at the situs of the accident we cannot say the trial judge abused his discretion in not allowing this evidence to come in.

Objections also were sustained to questions asked of the appellee's father concerning appellee's apparent degree of understanding of warnings given him not to play on or about the tracks near his house. Such testimony would clearly be improper. The father is not competent to testify as to what the child thought,

only as to what he did. The appellee's father was asked whether his wife ever warned Robert about the trains, but this clearly calls for hearsay testimony, and an objection to the question was properly sustained. Objections were also sustained as to the appellee's knowledge of the dangers of mine shafts. This was not an abuse of discretion. Hinnerichs v. Galbraith, supra. The appellant's knowledge of mine shafts was not in question, and the court below was in his rights in finding the question too far afield from the issue at bar. A question to a police officer concerning the existence of safety programs in the appellee's school was clearly improper. Unless the witness had been at one of these safety sessions, his answer would be hearsay. In addition, there is no evidence that the appellee was present at any of these sessions, if any there were. He had been in school only two and three-tenths weeks; if these sessions had been held but once a month, he might easily never have been present at one. Finally, there would also have to be proof as to what was discussed at the sessions. There would have to have been some evidence that the appellee was present at a session at which the danger of playing on railroad trains or tracks had been discussed.

As their next point of contention the appellants claim that two witnesses should not have been allowed to testify since they were not properly included on interrogatory answers. One witness was George Speer, the psychologist, who testified as to the appellee's mental capacity. The second was Laura Williams, a resident of the neighborhood who testified that the children of that area were in the habit of playing on the railroad tracks. Mr. Speer was not listed in the interrogatory calling for persons having knowledge of facts concerning the accident; Mrs. Williams was listed, but a wrong address was given.

27

As to Mr. Speer: The appellee engaged him shortly before trial to give the examinations discussed earlier and to report on the results. This was well after the time at which replies to the interrogatories were filed.

Appellants rely largely on the case of Nystrom v. Bub, 36 Ill App2d 333, 184 NE2d 273 (1962). In that case the court refused to permit an expert in blood chemistry to testify to a hypothetical question concerning the effects on a person of drinking a given amount of beer. The court held that the question of whether or not a person was drunk was one on which people generally were competent to testify, and was not the type of issue for which expert testimony was needed. The court in that case also mentions that the witness was not listed on the interrogatories, but we do not read this as the basis for its holding.

The Nystrom case does hold that the matter is one for the trial court's discretion, and we hold that the Court below did not abuse his discretion in permitting the psychologist, Mr. Speer to testify. We find no duty incumbent upon the appellee to keep the appellants informed of new witnesses after the interrogatories have been filed. We also note that during his opening argument, counsel for the appellee told the jury that they would show that Robert was of less than average intelligence. The railroads were certainly put on notice then that the issue of the appellee's intelligence would be brought into the case, and apparently they made no effort to try to meet this line of argument except to object when Mr. Speer was offered as a witness. The Court below did not abuse his discretion on this point.

As to Mrs. Williams: The appellants object that the wrong address was furnished them on the interrogatories. As the court said in Pink v. Dempsey, 350 Ill App 405, 411, 113 NE2d 334 (1953):

"Pretrial discovery is designed to permit exploration and to avoid surprise. It is like a proceeding for the filing of interrogatories, or, perhaps, a comprehensive bill of particulars. It is directed toward making the judicial process one of determining the facts appertaining to the issue and rendering a just decision thereon, rather than the promotion of a battle of wits between counsel."

We note in this case that Mrs. Williams testified only to the play habits of the children in the neighborhood. It was clear from the complaint that part of the appellee's case was that the children of the neighborhood habitually played on the railroad tracks. It could certainly have been no surprise to the appellants when such testimony was offered. We find that the railroads could not have been prejudiced by the introduction of this testimony. In addition, we note that the appellants, after discovering that the witness did not live at the address stated in the interrogatories, did nothing until her testimony was offered at the trial. We feel the appellants were not complying with the spirit of Sec 58(3) of the Civil Practice Act in not calling the attention of the appellee's attorney to this error. It would be cruelly unjust to permit a party to sit idly by, knowing an error had been made, and then ask to have a witness excluded when the time came for trial. A simple telephone call would have produced the correct address; we do not think that is too much to ask in the interests of justice.

■■ The appellants next object to the introduction of certain evidence at the trial. The first of these objections go to the fact that there was some evidence admitted that showed parcels of land adjacent to the railroads' right-of-way which were fenced. It is admitted that evidence of custom and usage is admissible where the conditions are similar but they point out

that the problems of fencing in a rectangular lot are quite different from fencing in an entire railroad right-of-way. As we noted earlier in this opinion, the entire right-of-way is not in question here; it is this immediate area with which we are concerned. We cannot say, therefore, that the trial judge was in error in admitting evidence which tended to show that other owners and occupiers of land in that vicinity considered it necessary to fence property to keep the children from climbing onto the tracks.

 The next objection goes to the admission of cards in the possession of the Pennsylvania Railroad concerning a history of the accidents which had occurred at that location. It is claimed that two of these accidents did not even occur on the Pennsylvania right-of-way, and that, therefore, there was no notice shown to that appellant. We point out that the Pennsylvania Railroad had these cards in its possession, since it produced them in response to discovery proceedings. It cannot claim that it did not have notice of what was on them.

 The final objection concerning the admission of evidence goes to the question of the exhibits offered by appellee. One of these exhibits was a plat map of the area of the accident. Upon objection of the railroads, the showing on the map of cyclone fences outside the immediate area in question was conceded as error, and that portion of the map which showed their presence was cut off. The result is a map with a large slit running along the railroad right-of-way. It certainly was impractical at the date of trial to have a new plat drawn up, so it was up to the Court below to balance the value of the evidence with the possibility of prejudice to the appellants. It has not been shown that the Court below abused his discretion.

 The same applies to a photograph taken of the scene of the accident. That photograph showed the

bridge at which the accident occurred with children playing on it. Before that evidence was permitted to go before the jury, the children were blacked out from the picture. We cannot say that such prejudice resulted from the introduction of this evidence that would require a new trial. Certainly, it would have been better had a clean picture gone to the jury, but we have not been shown an abuse of discretion or error such as to require a new trial. Brennan v. Leshyn, 51 Ill App2d 132, 201 NE2d 167 (1964).

The next error claimed, is that the court erred in allowing appellee's counsel to read previous statements made by one of the witnesses to rehabilitate that witness after cross-examination. The appellants' claim that the impeachment went to one small part of the testimony given on direct, and that the rehabilitation amounted to a grand repetition of the entire testimony on direct. The question of what is proper to rehabilitate the witness is one for the sound discretion of the trial court. We cannot say that discretion was abused in this instance. People v. Burke, 52 Ill App2d 159, 201 NE2d 636 (1964).

All in all, this court may not fully agree with each and every ruling which the Court below made with regard to the proffered evidence, but we cannot say that there was such an abuse of discretion that justice would demand a new trial. As has been often noted, few trials are completely free from the taint of error, and we will reverse only when some substantial prejudice has been shown. Kinsch v. DiVito Const. Co., Inc., 54 Ill App2d 149, 203 NE2d 621 (1964).

The appellants' last set of objections goes to the instructions given the jury. Their first claim is that the jury was improperly instructed as to the import of the Kahn case. They claim that plaintiff's instruction 4 (IPI Instruction 120.04) omits the requirement that the landowner must anticipate that children, because

31

of their immaturity, will fail to appreciate the risk involved. They claim, in addition, that the basic requirement of negligence has been left out.

To dispose of the second objection first, the requirement of negligence was not left out. The jury was instructed that to prove his case the appellee had to show among other things that there was a condition which the appellants knew or should have known involved a reasonably foreseeable risk of harm to children, and second, that the appellants knew or should have know that children would be likely to trespass on the premises. The proof of such a situation does constitute a proof of negligence under the Kahn doctrine, unless the defendants can show the cost of remedying the situation would be excessive.

As to the claim that the instruction left out the requirement that the landowner must anticipate that children, because of their immaturity, will fail to appreciate the risk involved, it is clear that had the jury found that children would have appreciated the risk involved in the moving railroad trains, it would have to have found that there was no reasonably foreseeable risk of harm to children. Had the children been able to foresee the risk, they would not have gone on the trains, and there would have been no reasonably foreseeable harm that could come to them. We feel that the instruction fairly covers all matters included in the Kahn doctrine.

The next objection is made to the instruction which sets forth the issues in the case. We have read the instruction carefully and feel that it adequately sets forth the issues. It is true that no mention was made in that instruction that the appellee had violated a Chicago Municipal Ordinance by flipping the train but the instruction included an Illinois Statute which was almost identical to the Chicago ordinance. As a result, the jury was informed that it was against

the law for the appellee to flip a ride on the train, so while it was technically error to omit to inform the jury that an ordinance had been violated as well, we cannot say that such error was prejudicial.

It is also claimed that this "issues" instruction fails because it does not set forth the Kahn doctrine, the appellants claiming that whether they violated that doctrine or not was the true issue of the case. We have, however, just discussed the instruction which dealt with the Kahn doctrine. Every issue of the case need not be in the same instruction. The jury was told to construe all the instructions together to determine what the law is. They were not misinformed.

The appellants claim it was error for the court not to instruct the jury that plaintiff was a trespasser on the right-of-way, and as a result, until his presence on the tracks was known, the Baltimore and Ohio owed him only the duty not to wilfully and wantonly injure him. The testimony was clear that his presence on the tracks was known by the engineer of the train. The evidence is uncontradicted that the engineer waved at the appellee and his brother and that they waved back. Moreover, the railroad had notice that children habitually played on the tracks. Having such notice, the railroad owed a duty of ordinary care to see that these children were not injured by their moving trains. This instruction, therefore, misstates the law and was properly refused.

The appellants offered instructions which stated that neither the Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Company, nor the Pennsylvania Railroad Company had a duty to build a fence on the premises in question. These were refused by the Court below. The refusal was proper, for, as we noted earlier in this opinion, the question of whether these railroads should have built a fence to keep the children off the tracks was a question of fact for the jury.

33

■ Finally, the appellants object to appellee's instruction which states: "More than one person may be to blame for causing injury. If you believe that one or more of the defendants were negligent and that its negligence caused injury to the plaintiff, it is not a defense that some other defendant or some third person may also have been to blame." This is basically IPI Instruction 12.04. The appellant's objection to this instruction is that it is negative in form; that the committee which wrote the IPI instructions said that negative instructions were frowned upon; that this instruction which tells what is "not a defense" was recommended in violation of the Committee's own standards; and that it was error to give it, for it could only add confusion. The appellee replies that the jury might feel that the City might be responsible for not building fences, or that the crew of the train which injured the appellee might be responsible. The jury was properly instructed that these appellants' negligence was in question, and the fact that someone else might have also been negligent was not a defense.

We hold that there was no prejudicial error committed in the course of the trial and we, therefore, affirm the judgment of the Court below.

Judgment affirmed.

BURKE, P. J. and LYONS, J., concur.