MARY P. CRESPO, Plaintiff-Appellant, *v.* JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.

First District (2nd Division)   No. 61804

Opinion filed August 10, 1976.

Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago (Joseph Riden, of counsel), for appellant.

Peterson, Ross, Rall, Barber & Seidel, of Chicago (Richard V. Henry, Jr., Joseph J. Hasman, and Ellen J. Kerschner, of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Mary Crespo, brought this action against defendant, John Hancock Mutual Life Insurance Company, to recover an accidental death benefit under an insurance policy issued by defendant to plaintiff's husband, the deceased. The jury returned a verdict in favor of defendant, and judgment was entered thereon.

Subsequent to the denial of plaintiff's post-trial motion, this appeal was perfected whereby plaintiff raises three principal issues: (1) whether authorization exists in Illinois permitting the designation of a witness as a "court's witness" in civil litigation; (2) if such practice is permissible, whether the trial court in the instant case erred in calling George Cobbs as a court's witness; and (3) whether prejudicial error was committed when the trial court admitted certain impeaching evidence introduced by defendant to contradict the testimony of Cobbs. In addition to these issues, plaintiff contends that prejudicial error was committed and the jury misled when the trial court excluded certain evidence sought to be introduced by plaintiff; that rulings of the trial court unduly restricted plaintiff in calling and examining certain witnesses in an attempt to counteract the impact of impeaching evidence introduced by defendant; that certain rulings of the trial court on tendered instructions were erroneous; and that plaintiff's motion for a directed verdict, and plaintiff's

subsequent motion for judgment notwithstanding the verdict, should have been granted.

This controversy raises a factual issue which our research indicates is novel to Illinois decisional law: whether the beneficiary of a life insurance policy may collect the accidental death benefit thereunder when the insured met his death while purportedly engaged in a game of "Russian roulette."

The pertinent facts follow. On November 12, 1968, plaintiff's husband secured a life insurance policy from defendant. One provision of that policy, which is the focal point of this appeal, provided for a $10,000 accidental death benefit, payable to the beneficiary of the policy, in the event that the insured's "Death resulted solely from an accidental bodily injury, * * *." The policy further provided, in pertinent part, as follows:

"ACCIDENTAL DEATH DEFINED.

The phrase 'accidental death' means death resulting directly and solely from

a. An accidental injury visible on the surface of the body or disclosed by an autopsy,* * *.

EXCEPTIONS AND EXCLUSIONS.

No benefit will be payable under this provision if the Insured's death results, directly or indirectly, or wholly or partially, from* * *

(2) Intentionally self-inflicted injury while sane, or self-inflicted injury while insane;* * *."

By her complaint, plaintiff, as beneficiary under the policy, alleged that on February 19, 1972, while the policy was in full force and effect, her husband, the insured, accidentally and fatally shot himself. It was further alleged that plaintiff had complied with all conditions precedent enumerated in the policy to warrant plaintiff's receipt of the accidental death benefit, but that defendant vexatiously refused to pay said benefit to her.

The sole defense asserted in defendant's answer to the complaint was a denial that the insured's "death resulted from an accidental bodily injury." In this regard, specific reference was made to the exclusionary language set out above.

Four witnesses testified during plaintiff's case-in-chief. Plaintiff described the deceased as a happily married person who enjoyed a good financial standing and had no apparent reason to intentionally take his life. The deceased obtained the death weapon, a .38-caliber B&S revolver, in December of 1971 for the purpose of increasing security at the grocery store he operated. He owned no other weapons for either sport or hobby, nor did plaintiff recall the deceased ever being trained in the use of guns.

Kenneth Belmar, who was 15 years old and employed by the deceased

on the date of the fatal incident, was the second witness to testify. During the afternoon on which the shooting occurred, the witness was laughing and joking in the deceased's store with the deceased and George Cobbs. The deceased pulled a gun from his pants and said, "Let's play Russian roulette." Thereupon, the deceased opened the cylinder of the gun, shook the gun until some bullets fell into his hand, closed and spun the cylinder, and then placed the barrel of the gun next to his head. The deceased pulled the trigger twice, and each time the witness heard a clicking sound. When the deceased squeezed the trigger a third time, the gun discharged, inflicting a fatal head wound.

On cross-examination, Belmar stated that he had never seen the death weapon prior to the fatal incident. After the deceased asked if either the witness or Cobbs would like to play Russian roulette, Belmar told the deceased to put the gun away. The deceased responded with laughter. Belmar did not see the deceased put a bullet into the gun after emptying it, and it was his recollection that the deceased put the bullets that had fallen from the gun into his pocket. When the deceased placed the gun to his head, the witness again asked the deceased to put the gun away, but the deceased laughed and pulled the trigger.

Belmar remembered giving a statement to a police officer on the date of the incident. However, he did not recall relating to any officer that he had seen the deceased put a bullet into the gun and suggest that they play Russian roulette.

After the death weapon was admitted into evidence, during the testimony of a representative of the coroner's office, plaintiff called as her final witness a person who qualified as an expert on guns. In response to a hypothetical question depicting a person attempting to unload a gun in a manner similar to that used by the deceased on the date of the fatal incident, the witness stated that it would be possible for a bullet to stick and remain in the gun under those circumstances. The witness explained that whether or not a bullet sticks in a gun is more dependent upon the size and brand of ammunition than on the type of gun being unloaded. It is possible for ammunition manufactured for use in a particular type of gun to get stuck in that type of gun. The witness demonstrated the proper technique for unloading a .38-caliber revolver, which involves depressing an extractor to assure that all bullets are removed. On cross-examination, the witness described the death weapon as appearing in good working condition.

Plaintiff then rested her case. Prior to calling its first witness, defendant made an oral motion requesting that the court call George Cobbs as a court's witness and allow defendant an opportunity to cross-examine Cobbs. In support of this motion, the court was advised that Cobbs was an eyewitness to the fatal incident and had given prior statements under

oath in connection with this incident. At the coroner's inquest, Cobbs testified that he observed the deceased put a bullet in the gun prior to pulling the trigger. Contrary to this statement, at a deposition Cobbs stated that he did not see the deceased put one bullet back into the gun. In addition to these sworn statements, it was asserted that an investigating officer interviewed both Cobbs and Belmar in the store shortly after the occurrence and, at that time, both gave statements indicating that one bullet was either left in the gun or put back into the gun by the deceased prior to his pulling the trigger.

At this point of the oral motion, the trial court interrupted counsel and ruled that a sufficient showing had been made to justify the court in calling Cobbs as a court's witness. A lengthy colloquy ensued between the court and counsel for both parties pertaining to the names of witnesses who might be called by defendant for impeachment purposes following Cobbs' testimony. Upon the completion of this discussion, defendant called William Juzkiw as its first witness.

Juzkiw was employed by the deceased and was present in the store on the date of the fatal incident, but he did not witness the shooting. The deceased purchased bullets, which appeared to be new, at or about the same time he purchased the gun. On one occasion, the witness observed the deceased shoot the gun at the floor, but he had never seen the deceased otherwise play with the gun or point it at anyone.

Belmar was then called as a witness by defendant, and he reiterated his previous testimony describing the manner in which the deceased unloaded the gun on the date of the incident. He did not recall seeing the deceased depress the extractor as the deceased shook bullets from the gun. Belmar also did not recall relating to a police officer at the scene that he had observed the deceased put a bullet back in the gun prior to pulling the trigger.

Over plaintiff's objection, George Cobbs was then called as a court's witness.[1] Under examination by defendant, Cobbs gave the following account of the occurrence. On the date of the incident, the deceased appeared to be happy and not under the influence of any stimulants. While talking with the witness and Belmar, the deceased pulled a gun from his pants, pointed it at Cobbs, and asked Cobbs if he would like to play Russian roulette. The deceased laughed when Cobbs rejected the offer. From a distance of 3-4 feet, Cobbs observed the deceased pour bullets from the gun into his hand and place them either in his pocket or

---

[1] Defendant's motion requesting the trial court to call Cobbs as a court's witness appears in duplicate at two different points in the record. It first appears at the chronological point indicated in the text of this opinion. It next appears immediately before Cobbs was called. Because of the colloquy which followed defendant's motion, it seems that the motion was made prior to Juzkiw's testimony, as indicated in the opinion.

on the table next to him. Cobbs did not recall seeing the deceased utilize the extractor when removing the bullets. After closing the cylinder, the deceased pointed the gun at his head and then again at Cobbs. Cobbs declined the deceased's second request to play Russian roulette and cautioned the deceased that he should put the gun away to avoid injury. The deceased laughed, placed the barrel to his head, and pulled the trigger. Cobbs heard about three clicks before the gun discharged, striking the deceased in the head. Prior to this incident, the witness had observed the deceased shoot the same gun on several occasions at different objects such as posters on the wall or bugs crawling on the floor.

The examination of Cobbs by defendant continued with a line of questioning pertaining to pretrial statements made by the witness. Cobbs recalled talking briefly to a police officer at the scene of the incident. he following testimony was elicited:

> "Q. Do you recall stating to this police officer shortly after Mr. Crespo shot himself, that you had seen Mr. Crespo empty the gun and put a bullet back in the gun and spin the chamber and put it to his head and fire it?
> A. I do."

Cobbs also recalled testifying at the coroner's inquest and appearing for a deposition. However, as the record indicates, he had difficulty remembering certain questions asked of him at the inquest:

> "Q. Mr. Cobbs, do you recall at the coroner's inquest being asked the following questions.
> 'Q. When you say we started kidding around, does that mean Mr. Crespo and you?
> A. Yes, we started kidding that the posters didn't look right and then he pulled out his gun and pointed it at me. I said, "Don't point the gun. It might go off." And we started kidding around about the posters and he pulled out his gun. He said watch this and he put one bullet back in the gun. He said, "Do you want to play Russian roulette?" And I said, "No." '
> Do you recall being asked that question and giving that answer?
> A. I guess so.
> Q. Now, this coroner's inquest transcript was shortly after the death of Mr. Crespo, wasn't it?
> A. It probably was.
> THE COURT: I must clarify something. I feel your answer is I guess so. Is there any doubt that this was your statement at the coroner's inquest?
> THE WITNESS: Yes, there's a doubt.
> THE COURT: There is a doubt?

THE WITNESS: Because I didn't read the papers after he got through with them.

\* \* \*

Q. Do you remember being asked that question?

A. I probably did.

Q. And do you remember giving an answer, whether or not it was that answer that I read, do you remember giving an answer?

A. I hardly remembered the question."

With respect to the deposition, Cobbs remembered being asked a series of questions, but he did not recall giving any answers.

Under examination by plaintiff, Cobbs testified that he was not shown a copy of the transcript for the coroner's inquest at the time he appeared at the deposition. He further stated that he was nervous and upset immediately after the incident and that his primary concern at that time was to get the deceased to a hospital.

At the conclusion of Cobbs' testimony and outside the presence of the jury, plaintiff made a motion that the court reconsider its ruling, which allowed Cobbs to be called as a court's witness, and instruct the jury to disregard certain testimony. Plaintiff's position was that calling a witness as a court's witness is now governed by the same rules applicable to hostile witnesses, and therefore, the elements contained in Supreme Court Rule 238 (Ill. Rev. Stat. 1973, ch. 110A, par. 238),[2] pertaining to hostile and surprise witnesses, must be satisfied before a party who calls a witness can be allowed to either cross-examine that witness or introduce impeaching evidence to discredit that witness' testimony. Plaintiff also suggested that a different rule regarding court's witnesses might apply in civil litigation since it is conceded that the practice is permissible in criminal actions.

Plaintiff's request was denied. The court distinguished a witness who is declared hostile from a witness who is called as a court's witness:

" 'Hostile' implies these are antagonists. But this is a witness that the Court feels should be called upon to testify and not be made the witness of one side or the other, which might mislead the jurors. And that was my intention when I made that comment to the jurors—that this is a court's witness and that the credibility isn't vouched for by either attorney."

The court further commented that express authorization is unnecessary to empower a court to call a court's witness since it is within the inherent power of a court to call a witness, who could offer relevant testimony, without requiring either party to vouch for the credibility of the witness.

---

[2] Rule 238 provides as follows:

If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements. .

The next witness called on behalf of defendant was a police officer whose primary function in this matter was to investigate the scene of the occurrence, interview witnesses, and determine whether a crime had been committed. It was his conclusion after conducting this investigation that no criminal activity had occurred. He recalled interviewing both Belmar and Cobbs at the scene of the incident. Both of these eyewitnesses related to him that they observed the deceased empty the gun, put one bullet back into the chamber, and play "Russian roulette."[3] Plaintiff's objections to this line of questioning were overruled.

Cross-examination revealed that Belmar and Cobbs appeared to the witness to be in a state of shock at the time they discussed the incident with him. The witness prepared a hospitalization case report, but the report did not indicate that either Cobbs or Belmar had stated that he saw the deceased put one bullet in the gun before pulling the trigger.

The court reporter who recorded and transcribed the proceedings at the coroner's inquest testified next. She recalled Cobbs testifying at the inquest that he observed the deceased put one bullet into the gun before it discharged. When defense counsel read the question and answer from the transcript of the coroner's inquest which corresponded to the court reporter's testimony, the witness stated that Cobbs' answer had been accurately transcribed by her. Plaintiff's objections throughout this line of questioning were overruled.

After this witness was excused, an extensive conference between court and counsel occurred out of the presence of the jury. Plaintiff argued that impeaching evidence attacking the purported testimony of Cobbs that he did not observe the deceased put a bullet into the gun before self-inflicting the fatal wound should not be admitted because Cobbs was neither asked a question which elicited this response, nor had he voluntarily offered this statement during his testimony. In essence, the contention was that evidence of prior statements cannot be admitted for the purpose of showing their inconsistency with testimonial statements purportedly made at trial when such trial statements were in fact never adduced.

---

[3] The revelation that both eyewitnesses related to this police officer that they had observed the deceased put one bullet into the gun was introduced for the purpose of impeaching the testimony of both Belmar and Cobbs. With respect to Belmar, the foundation for this impeaching evidence was laid during defense counsel's cross-examination of Belmar. Subsequent to the laying of this foundation, however, defendant called Belmar as its own witness. Again, Belmar denied disclosing to a police officer that he observed the deceased put a bullet in the gun. Thereafter, this police officer was called primarily for purpose of impeachment.

Although the propriety of this procedure for impeaching Belmar may appear to be improper, this same procedure was upheld in *People v. Van Dyke*, 414 Ill. 251, 111 N.E.2d 165. Since this question was neither raised by the parties nor is the resolution of this question necessary to this appeal, we will not consider it further.

In response, defendant maintained that regardless of whether Cobbs was directly asked at trial if he saw the deceased put a bullet back into the gun, Cobbs' omission of such a relevant and material fact from his step-by-step account of the fatal incident had the effect of rendering impeaching evidence on this point proper.

Consistent with its prior rulings, the court allowed the evidence which was introduced for impeachment purposes to remain in the record.

As a rebuttal witness, plaintiff called a police officer who had not previously testified in this trial. This officer had also interviewed Cobbs at the scene of the incident. His summation of the account of the incident as related to him by Cobbs did not include the statement that Cobbs observed the deceased return a bullet to the gun.

Upon this evidence, the jury returned a verdict in favor of defendant, thus denying recovery to plaintiff of the accidental death benefit.

■■ Plaintiff's initial contentvn on appeal is that no authority exists in Illinois providing for the practice in civil litigation of the trial court calling a witness as a court's witness.

The practice of the court calling a witness, and thereby relieving both parties of the burden of vouching for the credibility of that witness, was initially a procedural development in criminal law. But the circumstances under which this practice could be invoked were restricted. The supreme court first enunciated the parameters of the court's witness rule as it applied to criminal cases in *Carle v. People*, 200 Ill. 494, 66 N.E. 32 *(People v. Moriariy*, 33 Ill. 2d 606, 213 N.E.2d 516):

> Where the State's attorney knows that a witness was present at the scene of the [crime], but for some reason, either because he has no confidence in the witness, or for any other reason, he may doubt his veracity or integrity, he is not obligated to call such witness. In such case the court may call the witness, and leave him open for cross-examination by either side. (200 Ill. at 504, 66 N.E. at 36.)

The practice was confined to eyewitnesses of an alleged offense for whose veracity neither side would vouch, but whose testimony was deemed necessary to prevent a miscarriage of justice; trial judges were cautioned to exercise their right to call and examine witnesses with great care. *(People v. Cardinelli*, 297 Ill. 116, 130 N.E. 355.) The constraint which limited the class of potential witnesses which could be called by the court to eyewitnesses was subsequently eliminated *(People v. Siciliano*, 4 Ill. 2d 581, 123 N.E.2d 725; *People v. Touhy*, 361 Ill. 332, 197 N.E. 849), but it remains essential that a three-element foundation be laid by the party requesting the court to call a court's witness. *(Cf. People v. Wesley*, 18 Ill. 2d 138, 163 N.E.2d 500.) The moving party is required to show why he cannot vouch for the witness' veracity, that the witness could offer testimony which is relevant to the direct issues in controversy, and that a

miscarriage of justice might otherwise occur if the testimony is not brought to the attention of the trier of fact. (See *People v. Siciliano*.) But because both parties are entitled to cross-examine a court's witness and impeach the witness by showing prior inconsistent statements made by the witness, courts have condemned the utilization of the court's witness rule merely as a device for placing before the jury under the guise of impeachment a prior statement made by the witness. *People v. Chitwood*, 36 Ill. App. 3d 1017, 344 N.E.2d 611, citing Cleary, Handbook of Illinois Evidence §6.9 (2d ed. 1963).

■■ With regard to civil litigation, the procedure whereby a witness may be called by the court is not expressly authorized by the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 1 *et seq.*). However, section 60 of that act (Ill. Rev. Stat. 1973, ch. 110, par. 60), allows a party to call as a witness an adverse party, or agent thereof, and examine that witness as if under cross-examination. Moreover, in what constitutes an important departure from the general rule that a party is bound by the testimony he elicits from a witness whom he has called *(Hall v. Baum Corp.*, 12 Ill. App. 3d 755, 299 N.E.2d 156), section 60 authorizes the calling party to impeach the adverse witness by proof of prior inconsistent statements.

Supreme Court Rule 238 (Ill. Rev. Stat. 1973, ch. 110A, par. 238) is an extension of section 60. (Ill. Ann. Stat., ch. 110A, par. 238, Committee Comments, at 273 (Smith-Hurd 1968).) This rule expands the restricted range of situations in which a party may posit leading questions to its own witness and, more significantly, impeach the testimony of an occurrence witness called by it. However, notwithstanding the similarity between Rule 238 and the court's witness rule, decisions interpreting Rule 238 have unequivocally announced that "the Rule has nothing to do with making a witness a court's witness." *Cole v. Cole*, 116 Ill. App. 2d 344, 347, 253 N.E.2d 585, 587; *Kubisz v. Johnson*, 29 Ill. App. 3d 381, 329 N.E.2d 815.

Plaintiff argues that had the supreme court intended to retain, or provide for, the practice whereby a witness could be called as a court's witness in a civil case, it would have so provided in Rule 238. Plaintiff relies upon *Kubisz v. Johnson*, wherein the court stated, "The designation of [witnesses] as 'court's witnesses' is without authority of law in civil cases." 29 Ill. App. 3d at 383, 329 N.E.2d at 817.

Defendant attempts to uncover this apparent lack of authority by citing two cases which it maintains authorize the calling of court's witnesses in civil actions, regardless of whether the proceeding is a bench or jury trial. The cases, however, do not possess the precedential value on this point for which they are cited.

In *Green v. Smith*, 59 Ill. App. 2d 279, 207 N.E.2d 169, a personal injury action which was tried before a jury, the reviewing court sustained the trial court's act of calling a court's witness upon the motion of one of the

parties. But no attempt was made in the opinion to distinguish between the application of the court's witness rule in civil and criminal cases. Moreover, the court cited one criminal case and 37 Ill. L. & Pr. *Witnesses* §88 (1958) as supportive authority. Unfortunately, no civil case directly on point is cited in the latter. This case sanctioned the use in a civil case of a rule common to criminal procedure without the citation of authority to commission such use.

■■ And in *Wabash Life Insurance Co. v. Cadillac Associates, Inc.,* 72 Ill. App. 2d 413, 219 N.E.2d 639, the trial court recalled a witness so that a particular line of questioning could be pursued. On review, no error was found in this procedure, primarily because the trial court's exercise of power had the effect of curing a previous ruling by it whereby similar evidence was erroneously excluded. It was also considered significant by the court of review that the cause was tried without a jury, thus lessening the possibility that this procedure could have been prejudicial to appellant.

We consider *Green and Wabash* to be unpersuasive authority for the proposition urged by defendant. In fact, because the development of the court's witness rule in criminal cases has not been paralleled by a similar development in civil litigation in Illinois, no dispositive authority exists by which the legal issue confronting us can be resolved.

■■ The reason for the lack of civil case law on this point becomes understandable when the interests and rights attaching in civil and criminal cases are distinguished. During the trial of a criminal case, both court and counsel endeavor to arrive at the truth and ascertain all circumstances giving rise to the commission of the alleged offense in a manner consistent with the fundamental rights of the accused—a miscarriage of justice must be averted. To this end, broad discretion is granted to the prosecution in determining who should be called upon to testify. A situation can materialize where a potential witness is available who could offer testimony which is both relevant and material to the direct issues at bar, but for whose veracity the prosecution does not wish to vouch. It then becomes a discretionary matter for the trial court, if the interests of justice so dictate, to call that person as a court's witness, either sua sponte or upon motion by the State. Through this procedure, a fuller appreciation of the facts might result, and the safeguard remains that both sides are entitled to cross-examine the witness and, if the witness' testimony proves to be untrustworthy, to introduce impeaching evidence.

By way of contrast, in a civil action each side possesses differing interests in the controversy. Because of this disparity of interest, the parties often employ dissimilar trial strategies, tailored to their respective theories of the case, when adducing evidence and arguing their position to the trier of fact. Since trial tactics often are not readily apparent until

the close of evidence, it is important for the trial court to exercise judicial restraint in calling and examining witnesses; the court should not unnecessarily interfere with the trial strategies devised by counsel, and wide latitude should be extended to the parties in deciding in what posture their case should be presented to the fact finder. Moreover, in our adversary system of justice, the court should avoid giving the appearance to the jury of paying undue deference to the testimony of a particular witness which might result if the court called that witness. For these reasons, the practice of calling court's witnesses in civil litigation has been infrequently invoked.

Looking to other jurisdictions, it can be concluded that the practice of calling court's witnesses in civil cases is seldom utilized, but under limited circumstances, the practice has won general approval. (See *e.g.*, cases collected at 98 C.J.S. *Witnesses* §350 (1957).) Commentators have extended additional support to this practice. (9 Wigmore, Evidence §2484 (3d ed. 1940); Comment, *The Trial Judge's Use of His Power to Call Witnesses—An Aid to Adversary Presentation*, 51 Nw. U.L. Rev. 761 (1957).) But it has been noted that the exercise of this power by a trial court must strike a harmonious chord with both the necessity for judicial restraint and the maintenance of an atmosphere of impartiality, particularly when the introduction of evidence will be viewed and considered by a jury. *Band's Refuse Removal, Inc. v. Borough of Fair Lawn* (1960), 62 N.J. Super. 522, 163 A.2d 465.

■■ With this background of the court's witness rule in mind, in our opinion a trial court in a civil proceeding has the power and authority to call a court's witness upon motion of a party. But it is clear that the rule should be applied sparingly to permit such a witness to be called. Indeed, it is difficult to envision situations where the practice should be used, particularly in jury trials.

The instant case presents a good example of when a witness ought not to be called by the court and how the court's witness rule is prone to abuse.

Prior to trial, Cobbs had given statements on three different occasions pertaining to the fatal incident: during interviews with two investigating officers at the scene of the incident, at the coroner's inquest, and in a deposition. At the inquest and apparently during his conversation with one of the officers, Cobbs stated that he observed the deceased put one bullet into the gun immediately before the shooting. However, this fact was denied by Cobbs in a deposition. Due to the first two pretrial statements, plaintiff did not risk jeopardizing her case by calling Cobbs as a witness. Likewise, defendant did not wish to call Cobbs as its witness, even though testimony by Cobbs consistent with his first two extrajudicial statements could possibly have the effect of influencing the jury to accept

defendant's theory of the case. As was manifested in defendant's oral motion to the court requesting that Cobbs be called as a court's witness, defendant was apprehensive about vouching for Cobbs' credibility in light of his deposition.

■■ We consider it to have been an abuse of discretion for the trial court to grant defendant's motion and to call Cobbs as a court's witness. Cobbs was such an unreliable witness that neither party desired to include his testimony in their case-in-chief. Prior to trial, Cobbs made inconsistent statements while under oath concerning a fact which is so crucial to this case that the truth of these statements, whatever that might be, could conceivably have the effect of making or breaking the case for either side; whether the deceased knew that the gun was loaded at the time he pulled the trigger was a threshold inquiry that the jury had to address in determining whether the deceased met his death by accidental means. Had the deceased been aware that the gun was loaded, a judgment in favor of defendant would be sustainable. (See *Koger v. Mutual of Omaha Ins. Co.* (1968), 152 W. Va. 274, 163 S.E.2d 672; *Thompson v. Prudential Insurance Co. of America* (1951), 84 Ga. App. 214, 66 S.E.2d 119.) On the other hand, if the deceased was killed by what he thought was an unloaded gun, a much closer question is presented. No matter what Cobbs would have testified to regarding the deceased putting a bullet in the gun, the party damaged by his testimony would certainly introduce the applicable pretrial statement which was inconsistent with the statement made by him from the witness stand. Then the trial, as did indeed happen, would turn into a battle between counsel seeking to impeach or rehabilitate Cobbs' credibility. Thus the jury, which was already exposed to a complicated factual question raised by the terms of the insurance policy and the facts of this case, would immediately be confronted, and possibly confused, by a collateral issue—Cobbs' credibility; the credibility issue is the direct foreseeable result of calling Cobbs as a court's witness. Evidence of Cobbs' prior statements could not serve as substantive evidence, but rather could only be considered by the jury when passing upon Cobbs' veracity. *(People v. Collins,* 49 Ill. 2d 179, 274 N.E.2d 77.) But when viewing the record in its entirety, we cannot say that the jury's verdict was not predicated upon this impeaching evidence.

We believe that the preferable course of action would have been for the trial court to leave the burden on the parties to determine whether Cobbs should be called upon to testify. The parties should have attempted to ascertain, prior to trial, what Cobbs' testimony would be, and whether or not he would be able to satisfactorily explain the apparent inconsistency between his extrajudicial. statement and his testimonial statement. Perhaps this burden was accepted by both parties and yielded unsatisfactory results. If neither party was willing to vouch for Cobbs'

credibility, then, under the circumstances of this case, Cobbs should not have been called as a witness.

For these reasons, we hold that the trial court erred in calling George Cobbs as a court's witness, and this error was so prejudicial to plaintiff that a new trial on the merits is required.

Although not essential to the disposition of this appeal, it is worthwhile to examine the manner in which impeaching evidence was introduced in this case since the cause would have been remanded on this point alone had we not already determined that the trial court's abuse of discretion in calling Cobbs as a court's witness resulted in prejudicial error.

■■ Evidence of a prior statement made by a witness which is inconsistent with a statement made by him while on the witness stand is admissible to impeach his credibility *(People v. Moses,* 11 Ill. 2d 84, 142 N.E.2d 1), provided the statement pertains to a material and relevant matter in issue. *(Patmon v. Coffey,* 12 Ill. App. 3d 117, 298 N.E.2d 216.) Except for admissions by a party witness *(People v. Ellis,* 41 Ill. App. 3d 377, 354 N.E.2d 369), evidence of the extrajudicial statement is not admitted to establish the truth of the matters asserted therein, but rather for the limited purpose of casting doubt on the testimonial statements of the witness by showing his inconsistency. *People v. Moses.*

■■ Before this type of impeaching evidence becomes admissible, however, certain foundational elements must be satisfied. It is of course essential that a statement be made at trial to which an inconsistency with a prior statement can be shown. The witness, if not a party, must then be alerted concerning the prior statement in order to avoid unfair surprise and also to allow the witness an opportunity to explain or clarify the apparent inconsistency. *(People v. Moses.)* Extrinsic evidence, either oral or documentary, need not be introduced if the witness unequivocally admits making the out-of-court statement, but if the witness denies or fails to recall making the prior statement, then it is incumbent upon the examining party to offer evidence of that statement. *(Goldstein v. Hertz Corp.,* 16 Ill. App. 3d 89, 305 N.E.2d 617; *Owens v. Guerney,* 241 Ill. App. 477.) Once a witness has been impeached, what evidence is proper to rehabilitate the witness is a question for the sound discretion of the trial court. *(Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd,* 42 Ill. 2d 103, 245 N.E.2d 762.) As a general rule, when a witness has been impeached by evidence of previous inconsistent statement, evidence of another extrajudicial statement made by the witness which is consistent with his testimony is not admissible. *People v. DePoy,* 40 Ill. 2d 433, 240 N.E.2d 616.[4]

---

[4] Plaintiff urges that certain rulings by the trial court excluding evidence tendered by plaintiff were erroneous. With regard to evidence which was being offered in an attempt to rehabilitate Cobbs' credibility, we find no error.

■■ Under cross-examination by defendant, Cobbs was not asked whether he observed the deceased put a bullet into the gun before pulling the trigger. Although Cobbs omitted any reference to this fact in his account of the fatal incident, such omission was insufficient to entitle defendant to introduce impeaching evidence on this point. (See generally *Ritzman v. People,* 110 Ill. 362.) Irrespective of the lack of an impeachable statement, defendant proceeded to lay a foundation for the introduction of impeaching evidence. Cobbs unequivocally admitted making a statement, which was beneficial to defendant's position, to an investigating officer. But at no time during this line of questioning did defendant offer Cobbs an opportunity to explain or clarify this prior inconsistent statement. Although extrinsic evidence of this statement was unnecessary, defendant subsequently called the officer as a witness in order to elaborate upon the interview of Cobbs he conducted. To compound the prejudice to plaintiff arising from the improper manner in which the impeachment of Cobbs was handled, defense counsel urged the jury during closing argument to accept Cobbs' out-of-court statements as the truth of the matters asserted therein. But see *People v. Krug,* 38 Ill. App. 3d 383, 347 N.E.2d 807, for a discussion on whether this type of impeaching evidence may be properly considered by the jury as substantive evidence.

■■ This entire procedure, from the calling of Cobbs as a court's witness to defendant's closing argument, is illustrative of why the court's witness rule should be sparingly used in civil litigation since it affords a party the opportunity to bring damaging evidence to the attention of the trier of fact under the guise of impeachment.

In view of the foregoing, we deem it unnecessary to address in this opinion the other contentions argued by plaintiff. The judgment of the circuit court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Judgment reversed; cause remanded with directions.

DOWNING and JIGANTI, JJ., concur.