RICHARD G. LOWE et al., Plaintiffs-Appellees, v. NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellant (General American Transportation Corporation et al., Defendants-Appellees; Monsanto Company, Defendant-Appellee and Third-Party Plaintiff, v. Willamette-Western Corporation, Third-Party Defendant).

Fifth District   No. 5—82—0687

Opinion filed April 19, 1984.

Albert E. Schoenbeck and Stephen M. Schoenbeck, both of Schoenbeck, Tucker & Schoenbeck, of St. Louis, Missouri, and Edward J. Kionka, of Carbondale, for appellant.

W. Munro Roberts, Jr., and Ted L. Perryman, both of Roberts & Heneghan, Inc., of St. Louis, Missouri, for appellee Dresser Industries, Inc.

Kenneth R. Heineman, Bruce D. Ryder, and Ronald L. Hack, all of Coburn, Croft & Putzell, of Belleville, for appellee Monsanto Company.

Robert W. Wilson and Madelyn J. Lamb, both of Burroughs, Simpson, Wilson, Hepler, Broom & McCarthy, of Edwardsville, for appellee General American Transportation Corporation.

Paul L. Pratt and R. E. Schum, both of Paul L. Pratt, P.C., of East Alton, and Paul C. Verticchio, of Verticchio and Verticchio, of Gillespie, and C. William Fechtig, of Carmi, for other appellees.

JUSTICE WEBBER delivered the opinion of the court:

This appeal from a judgment order of the circuit court of Madison County arises out of an event which occurred on the night of January 10, 1979, at Sturgeon, Missouri. At about 11:15 p.m. on that occasion a tank car being transported by the defendant, Norfolk and Western Railway Company (N&W), left the rails and was punctured by its own running gear. It contained a cargo of a chemical substance, liquid in form, manufactured by the defendant, Monsanto Company (Monsanto). This cargo was described in general terms as orthoch-

lorophenol crude. It leaked from the tank car at the site of the derailment and continued to do so after the tanker was removed to the Moberly, Missouri, yards of the N&W where it was cleaned and repaired.

The plaintiffs in the instant suit, 47 in number, were employees of the N&W who worked at or about the spill site or on the tanker in the yards at Moberly. They alleged various physical ailments arising from exposure to the chemical cargo. Each of the cases involved charges of negligence under the Federal Employers' Liability Act (FELA) (45 U.S.C. sec. 51 *et seq.* (1976)) and the Safety Appliance Act (45 U.S.C. sec. 1 *et seq.* (1976)) against N&W. Plaintiffs also sued General American Transportation Company, the manufacturer of the tanker, under a products liability theory; Dresser Industries, Inc., the manufacturer of a portion of the running gear of the tanker, under a products liability theory; and Monsanto Company, the manufacturer of the chemical, for negligence, wilful and wanton misconduct, and under a products liability theory. As the suits progressed, the defendants all filed counterclaims, cross-claims, and third-party claims against each other, seeking indemnity and contribution.

The trial court consolidated all 47 suits for trial. Prior to trial (events which will be more fully discussed hereinafter), the defendants General American Transportation Company (GATX), Dresser Industries, Inc. (Dresser), and Monsanto were dismissed together with N&W's counterclaims against them, and the cases were submitted to the jury on N&W's violations of the FELA. One case of the 47, plaintiff Little, proceeded on simple negligence in addition to the FELA count.

The jury returned verdicts in favor of all plaintiffs and against the N&W. The amounts ranged from $1,950,000 to $300,000. The total was $57,965,000. Judgment was entered on the verdicts by the trial court, N&W's post-trial motion was denied, and this appeal followed. N&W, as appellant, appeals all of the individual judgments, as well as the dismissal of its counterclaims against the other defendants. We have taken two motions with the case: (1) motion of Dresser to dismiss N&W's appeal against it, and (2) motion of Monsanto to supplement the instant record with certain extracts from the record of kindred litigation now pending in the circuit court of Madison County. Both motions are now denied for reasons which will be explicated below.

As might be anticipated in a case of this nature, a variety of issues have been raised on appeal. We have concluded that there are errors of law of sufficient gravity to mandate a new trial. This being so, certain consequences follow: (1) No necessity exists for a detailed ex-

plication of the facts and the evidence presented, nor to pass judgment on the sufficiency of that evidence; (2) many issues raised here will become moot on retrial; and (3) only if the retrial takes place in Illinois will much of what we have to say become the law of the case, since we cannot, and do not purport to, bind the courts of a sister State.

Of all the issues raised we deem four to be of prime importance. We regard each as being of equal importance to its fellows, but will discuss them in the following order: (1) the trial court's denial of N&W's *forum non conveniens* motion; (2) the dismissal of N&W's counterclaims against GATX, Dresser, and Monsanto; (3) the consolidation of the 47 cases; and (4) the trial court's dismissal and substitution of jurors. The remaining issues, which are principally of an evidentiary or procedural nature, will be dealt with more summarily. Factual matters, as needed for a more complete comprehension of the issues, will be discussed in connection with the individual issues.

## FORUM NON CONVENIENS

The rules governing this doctrine have recently been stated and restated at length by the supreme court, so no good purpose would be served by reiteration here. (See *Wieser v. Missouri Pacific R.R. Co.* (1983), 98 Ill. 2d 359, 456 N.E.2d 98; *Moore v. Chicago & North Western Transportation Co.* (1983), 99 Ill. 2d 73, 457 N.E.2d 417.) In our opinion the factors by which a defendant's motion to dismiss for *forum non conveniens* should be judged weigh heavily in favor of N&W in this case.

As its name implies, the doctrine's fundamental premise is that of convenience: convenience of the parties, convenience of the witnesses, convenience of the court and jurors and convenience of those who must bear the expenses of maintaining the judicial system, the taxpayers. The plaintiffs' choice of a forum is no longer accorded the weight which it formerly possessed. When the plaintiffs' home forum is chosen, it is reasonable to presume that the choice is convenient, but when the plaintiffs choose a foreign forum, the choice is entitled to less deference. (*Piper Aircraft Co. v. Reyno* (1981), 454 U.S. 235, 70 L. Ed. 2d 419, 102 S. Ct. 252; *Jones v. Searle Laboratories* (1982), 93 Ill. 2d 366, 444 N.E.2d 157.) When plaintiffs pursue the foreign forum in the face of a motion to dismiss, they take a calculated risk of reversal. *Espinosa v. Norfolk & Western Ry. Co.* (1981), 86 Ill. 2d 111, 427 N.E.2d 111.

In the instant case, all 47 plaintiffs were residents of central Missouri. Ninety-nine witnesses testified at trial either in person or by

deposition. Of these 77 were residents of Missouri, the great majority of them from the central part of the State. Ten witnesses were from Illinois; of these six were from the Chicago area, one from Decatur, and three from the Madison County area. Eleven witnesses came from other States: Virginia, Louisiana, Florida, North Carolina, Kentucky, Kansas, Texas, and New York.

All of the Chicago area witnesses were plaintiffs' experts; there is no reason to assume that they would not go wherever plaintiffs desired; furthermore, their presence in the forum is not entitled to consideration in determining convenience. Any contrary rule would permit plaintiffs to employ experts located in inconvenient fora and thus circumvent the rule. (*Norman v. Norfolk & Western Ry. Co.* (1974), 228 Pa. Super. 319, 330, 323 A.2d 850, 855-56; *Espinosa v. Norfolk & Western Ry. Co.* (1981), 86 Ill. 2d 111, 124, 427 N.E.2d 111, 118.) Of the four remaining witnesses who lived in Illinois, one was an investigator for plaintiffs' attorney, one was an employee of Monsanto, and two were employees of N&W. None of them added anything of great significance to the record, which is in excess of 16,000 pages.

It is apparent that the convenience of the great majority of the witnesses would have been better served by a trial in central Missouri; the Illinois experts would have gone anywhere; the locale of the trial would have been a matter of no great consequence to the witnesses from other States.

Apart from the residence in the Madison County area of three witnesses and of plaintiffs' attorney, the only other connection with Madison County was the possible passage of the tanker through the county. It was loaded at Monsanto's plant in St. Clair County and delivered to N&W's yard in St. Louis, Missouri, by Terminal Railroad Association of St. Louis. N&W at no time had possession of the tanker in Illinois; it is therefore manifest that any possible tortious conduct on its part must have occurred in Missouri.

In *Wieser* the supreme court listed several factors to be considered in such cases:

"There is no justification for imposing the burden of this litigation upon the judicial system of Illinois and of St. Clair County. If Illinois had any connection with the litigation such as the residence of the plaintiff, or the principal place of business of the defendant, or the *situs* of the accident, or of the decedent's employment, it would have had an interest in providing a forum in which to resolve the dispute." *Wieser v. Missouri Pacific R.R. Co.* (1983), 98 Ill. 2d 359, 371-72, 456 N.E.2d 98, 104.

To apply these criteria to the instant case is to answer the ques-

tion with clarity. None of the plaintiffs were residents of Illinois; N&W's principal place of business was Roanoke, Virginia; the *situs* of the accident was Sturgeon, Missouri; the plaintiffs' employments were either at Sturgeon or Moberly, Missouri. Not even a gossamer thread binds this case to Illinois.

Moreover, we are persuaded that N&W suffered prejudice in being forced to trial in Madison County. One of its principal defenses was that the conditions of ill-being of the plaintiffs, if any, existed long before the derailment and clean-up. To establish the defense the testimony of plaintiffs' local physicians concerning their prior medical history was needed. Since the plaintiffs and their physicians were residents of central Missouri, N&W's recourse had to be to depositions of the physicians rather than live testimony. The supreme court has held that depositions are an inadequate substitute for live testimony. *Jones v. Searle Laboratories* (1982), 93 Ill. 2d 366, 374, 444 N.E.2d 157, 161.

Plaintiffs make the assertion in their brief:

> "[If these cases would have been tried in Missouri] [t]he railroad still would have utilized depositions of the doctors from central Missouri because no experienced trial lawyer with any common sense subpoenas a physician and requires him to involuntary come into court because of the potential adverse reaction of the witness assuming, of course, that the witness was unwilling in the first place."

However, they cite no authority nor any empirical studies attesting to the accuracy of the statement. It is generally accepted by the bench and bar that it is difficult to get physicians to court, but it is by no means impossible. N&W should have had the opportunity to attempt to present live medical testimony rather than the sing-song reading of dry depositions.

Plaintiffs in their brief have also raised several points of a technical nature relating to the N&W's forum motion. First, they claim that supporting materials to the motion were inadequate.

The initial forum motions were made by Monsanto and Dresser. N&W was granted permission to join in them. Later, N&W filed a number of motions of its own; however, none was verified, and all were denied. Still later, N&W filed renewal forum motions in substantially the same form, but verified. The record contains no indication as to whether these motions were ever ruled upon by the trial court. Finally, in February 1982, before trial began on March 15, 1982, N&W filed a motion to reconsider the prior forum motions. In this motion N&W relied almost exclusively on the supreme court's deci-

sion in *Espinosa,* and incorporated by reference certain discovery answers theretofore made by it. This motion was denied.

Plaintiffs rely on two earlier cases (*Cotton v. Louisville & Nashville R.R. Co.* (1958), 14 Ill. 2d 144, 152 N.E.2d 385, and *McKinney v. Hougland Towing Co.* (1969), 109 Ill. App. 2d 99, 248 N.E.2d 322) for the proposition that a forum motion must be supported by a factually adequate affidavit which should state the content of the testimony of potential witnesses residing in distant fora and should contain a commitment on the part of the defendant to call such witnesses.

In our opinion these authorities have been superseded by later case law. In *Piper Aircraft* the Supreme Court rejected similar contentions. A recent opinion of this court (*Petersen v. Chicago & North Western Transportation Co.* (1983), 117 Ill. App. 3d 163, 453 N.E.2d 27) held that an affidavit which specifically referred to witnesses and named a treating physician was sufficient.

In the instant case, while the motions are no models of clarity, we believe that they are sufficient under *Petersen.* The motion to reconsider refers to sworn documentary evidence, and the plethora of depositions in the file at the time of the motion makes clear that the persons named would be called as witnesses. All of the relevant facts were either before the trial court, or accessible to it.

Significantly, no objection by plaintiffs was raised at trial to the form of the motion last filed. In *Pence v. Village of Rantoul* (1973), 12 Ill. App. 3d 446, 298 N.E.2d 775, the court held that vague objections at trial to a motion for summary judgment, which was equally vague, would not sustain more specific objections on appeal. If vague objections at trial are insufficient on appeal, so much more so are no objections at all.

Plaintiffs also argue the fact that prior to trial N&W filed a petition for *mandamus* and a petition for leave to appeal in the supreme court concerning the *forum non conveniens* rulings of the trial court; both petitions were denied by that court. From this, and relying on *Espinosa,* plaintiffs maintain that the subject has been foreclosed. We do not agree.

The supreme court was careful in *Espinosa* to limit a denial of a petition for *mandamus* in that case to its facts. The court said, "While our denial is *ordinarily* meaningless in a consideration of an alleged error on appeal, it is not totally irrelevant *here* ***." (Emphasis added.) (*Espinosa v. Norfolk & Western Ry. Co.* (1981), 86 Ill. 2d 111, 125, 427 N.E.2d 111, 118.) The basis of the court's ruling was the failure to present figures on court congestion to the trial judge; such is not the situation in the instant case; figures were presented.

■ Even though after this case was tried the Supreme Court Rule on interlocutory appeals by permission (87 Ill. 2d R. 306(a)(1)(ii)) was amended to include denial of forum motions, it still remains the legal reality that the denial of a petition for an extraordinary writ, or the denial of a petition for interlocutory review, means only that a majority of the upper court could not be mustered in favor of the petition. It is not an exotic form of *res judicata*.

■ In summary, it is our opinion that all of the factors to be considered in a forum motion favor the defendant N&W in this case. It is also our opinion that N&W suffered prejudice by the denial of its forum motions in being deprived of subpoena power, and hence live testimony, over the plaintiffs' local physicians. It follows that it was an abuse of discretion by the trial court to deny the motions, and we believe that the abuse constituted reversible error.

It remains to be decided what to do under the circumstances. We have elected to follow *Wieser*. Therefore, part of our judgment order will be that the judgments of the circuit court of Madison County are reversed and the cause will be remanded to that court with directions to allow the *forum non conveniens* motions of the defendant N&W and to dismiss the cause; subject, however, to the following conditions: (1) if plaintiffs elect to refile this suit within one year of the final disposition of this case in an appropriate forum, presumably central Missouri, N&W will accept service of process from that court, and (2) if the statute of limitations has run in the appropriate forum, N&W will waive that defense. If N&W shall refuse to abide such conditions, then the cause will be remanded to the circuit court of Madison County for a new trial in accordance with the views set forth hereinafter.

We are aware that if this suit is refiled in another jurisdiction, we have no authority, nor inclination, to dictate to that court how it should be tried. Therefore, what follows will apply only in the event of a retrial within this jurisdiction.

## DISMISSAL OF COUNTERCLAIMS

As has been indicated, during the progress of this litigation N&W filed counterclaims for contribution and indemnity against GATX, Monsanto, and Dresser. The latter also filed counterclaims against N&W and against each other. Monsanto also filed a third-party complaint against Willamette-Western Corporation, the organization which conducted the clean-up operations at Sturgeon. On the opening day of trial, March 15, 1982, counsel for plaintiffs appeared in court and represented that settlement had been made with GATX, Mon-

santo, and Dresser as follows: Monsanto—$3,500,000; Dresser—$2,175,000; GATX—$1,325,000. A covenant not to sue between plaintiffs and Monsanto appears in the record; no such covenants appear as to the other counterdefendants; however, in view of the size of the record, we shall assume that some such document was executed by them.

After the settlements were announced, all counterdefendants moved to dismiss with prejudice N&W's counterclaims against them, and to dismiss without prejudice their counterclaims against N&W and each other. The representation was that the dismissals were sought under the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1981, ch. 70, par. 301 *et seq.*). Monsanto also moved to dismiss without prejudice its third-party complaint against Willamette-Western Corporation.

N&W's counsel professed surprise, stating to the court that as late as 6 p.m. the prior evening all defendants were working on an agreement to apportion any judgment which might be entered in favor of the plaintiffs and that one of the conditions of the agreement was that no defendant would enter into a settlement with the plaintiffs. He described the railroad's position as that of being "sandbagged." The trial court allowed the motions to dismiss, commenting, "I think the paramount thing here is the purpose of that contribution statute."

■ The first matter occupying our attention is the motion of Dresser to dismiss N&W's appeal as against it. We have taken that motion with the case. Dresser makes four points in support of the motion:

1. Upon dismissal of the N&W counterclaim the trial court lost jurisdiction and Dresser ceased to be a party to the suit. No authority is cited for this proposition, and it ignores certain fundamental principles. This is a case involving multiple claims and multiple parties. Jurisdiction remains in the trial court until all issues are settled. (*Whitley v. Lutheran Hospital* (1979), 73 Ill. App. 3d 763, 392 N.E.2d 729.) The chief exception to the rule is a partial appeal under Supreme Court Rule 304(a) (87 Ill. 2d R. 304(a)) wherein a portion of the case may be appealed under the conditions described in the Rule. The Rule itself provides that any judgment which adjudicates fewer than all the claims of fewer than all the rights and liabilities of all the parties is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, or liabilities. The dismissal of the counterclaim was only a partial judgment and

no finding was sought under the Rule. The trial court retained jurisdiction of Dresser.

2. N&W failed to appeal the dismissal. For the reasons just set forth, it could not in the absence of a finding by the trial court under Rule 304(a). The record shows that just such a finding was sought and denied by the trial court. Dresser further argues that Rule 304(a) should not apply because it is a procedural rule and cannot curtail a substantive statute, *viz.*, the Contribution Act. The argument is without merit. All procedural rules necessarily categorize and channel substance. It is the essence of the law. A further argument is that the settlement was made in good faith and hence operated to make the order final. Good faith is a requirement under the Contribution Act, but the Act has nothing to do with the appealability of orders.

3. Dresser argues that N&W failed to file its notice of appeal within 30 days after the entry of the judgments. The argument ignores Supreme Court Rule 303(a) (87 Ill. 2d R. 303(a)) which tolls the appeal time until after disposition of a timely post-trial motion. The record shows that N&W filed a timely post-trial motion and appealed within 30 days of its denial.

4. N&W failed to ask post-trial relief against Dresser. Dresser points to section 2—1202(e) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1202(e)) which provides that a party who does not ask for a new trial in his post-trial motion waives such right. The argument contorts the language of N&W's post-trial motion. In it the railroad sought "new and separate trials as to each of the 47 plaintiffs." By necessary implication a new trial will involve all parties. In addition, N&W specifically complained in its post-trial motion as to the dismissal of its counterclaims against the other defendants. If the railroad never had a trial on its counterclaims in the first place, it escapes us how it can seek a new trial on the same matter. N&W's post-trial motion was sufficiently specific to cover this point.

For all the foregoing reasons, Dresser's motion to dismiss the appeal as to it is denied.

We turn next to the merits of the dismissal of N&W's counterclaims. For better understanding of our disposition of these, a brief description of their allegations and structure is in order. There were six counts in all, two against each of the other defendants; each count was premised upon contribution and implied indemnity; one series of

counts, *viz.*, I, III, and VI alleged a theory of strict liability; the other series, *viz.*, II, IV, and V, alleged a theory of negligence. For our purposes it will be convenient to break these down into a discussion of (1) contribution on theories of negligence and strict liability; and (2) implied indemnity on theories of negligence and strict liability.

■ All of the counterdefendants argue with varying degrees of vehemence that the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1981, ch. 70, par. 301 *et seq.*) has abolished implied indemnity. (There is no claim of contractual indemnity in this case.) We do not agree. Implied indemnity no longer holds the premier status which it had prior to the supreme court's decision in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437, and its codification in the Contribution Among Joint Tortfeasors Act. However, it still holds its place in particular situations, especially in the area of strict liability. The supreme court in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 624, 210 N.E.2d 182, 188, said:

> "Dean Prosser in the chapter of his book covering joint tort-feasors (Prosser, Law of Torts, chap. 8. 3d ed. (1964),) points out, 'There is an important distinction between contribution, which distributes the loss among the tort-feasors by requiring each to pay his proportionate share, and indemnity, which shifts the entire loss from one tort feasor who has been compelled to pay it to the shoulders of another who should bear it instead. ***' "

■ As to the contribution claims of N&W, we are of the opinion that the trial court properly dismissed these.

Section 2(c) of the Contribution Among Joint Tortfeasors Act provides:

> "When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater." (Ill. Rev. Stat. 1981, ch. 70, par. 302(c).)

The parties are in agreement that the dismissal was made under section 2(d) of the Act (Ill. Rev. Stat. 1981, ch. 70, par. 302(d)) and that the good faith provision of section 2(c) is the triggering device. N&W argues that there was a lack of good faith as evidenced by (1) the ra-

tio of the settlements to the verdict; (2) the tactical advantage gained by plaintiffs in removing Monsanto from the case; and (3) the failure of the settlements to account for the relative degree of fault of the parties.

The ratio test found root in some California decisions. The California statute is parallel to the Illinois statute in its good faith language. At one time the California courts viewed the good faith requirement as a protection against unreasonably low settlements. It was enunciated in *River Garden Farms, Inc. v. Superior Court* (1972), 26 Cal. App. 3d 986, 996, 103 Cal. Rptr. 498, 505, where the court said that "[a]lthough many kinds of collusive injury are possible, the most obvious and frequent is that created by an unreasonably cheap settlement. \*\*\* The price of a settlement is the prime badge of its good or bad faith." One Illinois court has indicated that the ratio of the settlement to the final award of damages is one measure of good faith. *LeMaster v. Amsted Industries, Inc.* (1982), 110 Ill. App. 3d 729, 442 N.E.2d 1367.

More recent California authorities have abandoned the ratio test of *River Garden Farms.* (See *Stambaugh v. Superior Court* (1976), 62 Cal. App. 3d 231, 132 Cal. Rptr. 843; *Dompeling v. Superior Court* (1981), 117 Cal. App. 3d 798, 173 Cal. Rptr. 38; *Kohn v. Superior Court* (1983), 142 Cal. App. 3d 323, 191 Cal. Rptr. 78.) The rule in that jurisdiction now appears to be that a settlement will be considered in good faith when no tortious or wrongful conduct on the part of the settling defendant has been shown. A settlement of less than 1.3% of the alleged damages has been upheld. *Wysong & Miles Co. v. Western Industrial Movers* (1983), 143 Cal. App. 3d 278, 191 Cal. Rptr. 671.

We believe that this is the sounder approach. The ratio test necessarily relies upon hindsight. It is virtually impossible to use an unknown factor, *i.e.,* the jury's verdict, to test good faith prior to trial.

There are two policies to be served by the Contribution Among Joint Tortfeasors Act: (1) the encouragement of settlements, and (2) the equitable sharing of damages. Under the *River Garden Farms* approach, equitable sharing took precedent; the later authorities have placed settlement in the priority position. The Uniform Contribution Among Tortfeasors Act is in many respects parallel to the Illinois Contribution Among Joint Tortfeasors Act. We find the history of the Uniform Act and the Commissioners' Comments thereto instructive.

The 1939 version of the Uniform Act provided for release of a settling defendant if the settlement agreement provided that the plaintiff's damages were to be reduced "to the extent of the *pro rata*

share of the released tort-feasor." This was a distinct emphasis on equitable sharing. The Uniform Act was amended in 1959 to eliminate the reduction clause and the release was conditioned only on good faith. The Commissioners' Comments concluded that "[i]t seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly the subsection provides that the release in good faith discharges the tortfeasor outright from all liability for contribution." 12 Uniform Laws Annotated, Commissioners Comments 100 (1975).

We are of the opinion that the ratio of the settlements in the instant case to the ultimate verdicts does not demonstrate bad faith.

N&W's next argument is that by settling with Monsanto plaintiffs gained a tactical advantage, thereby showing lack of good faith. The same argument is not pursued against Dresser and GATX. As stated in its brief, N&W claims that plaintiffs pursued their cases against the carrier of the chemical rather than its manufacturer, thereby gaining the advantage of eliminating the testimony of many Monsanto employees who had a superior knowledge of the toxicity of the chemical and were thus better able to refute the claims of plaintiffs' experts. We do not agree and know of no principle of law which says that one tortfeasor is entitled to the benefit of the witnesses of another.

N&W cites *Commercial Union Insurance Co. v. Ford Motor Co.* (9th Cir. 1981), 640 F.2d 210. In that case the plaintiff sued Ford Motor and one of its dealers for personal injuries. Ford Motor was dismissed, and a large judgment was obtained against the dealer. The dealer's insurer sought indemnity against Ford Motor, but the trial court dismissed the action under the California contribution statute. The court of appeals reversed, holding that the removal of the "deep-pocket" defendant deprived the remaining defendant of the advantage of the experts and skilled counsel which Ford Motor could afford to employ.

While not conceding that *Commercial Union* represents good law, we find it distinguishable. It relied in great part on *River Garden Farms*, which, as we have noted, is no longer followed in California. More significantly, Ford Motor paid nothing for its dismissal—it became a *nudum pactum*. In the instant case, Monsanto paid $3.5 million.

N&W's next good faith argument is that the trial court failed to take into consideration the relative culpability of the parties. It arrives at this conclusion from a reading of *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, and *Skinner*. As with the ratio argument, we

know of no way in which relative culpability could be ascertained prior to evidence being taken. Furthermore, neither *Alvis* nor *Skinner* touches upon the question of the effect of a settlement; the former established comparative negligence and the latter abolished the rule of no-contribution.

With no evidence of tortious or wrongful conduct, it does not appear that the settlements were lacking in good faith.

N&W makes a final argument that the trial court should have held a hearing on the matter of good faith. We note at the outset that the Illinois Contribution Act makes no provision for such a hearing. Some California authorities indicated in an oblique manner that a hearing might be held. In 1980 the California statute was amended to provide:

> "The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response thereto, or the court may, in its discretion, receive other evidence at the hearing." (Cal. Civ. Pro. Code sec. 877.6(b) (Deering 1983 Supp.).)

We believe that this represents a sensible approach. In the instant case, the trial court had a mountain of depositions and other discovery materials before it and appeared to be well cognizant of the facts and issues in the matter. Whether he needed additional materials was a matter of discretion.

We note that in any event N&W did not request a hearing in the trial court, nor did it raise the question in its post-trial motion. Matters not considered by the trial court may not be considered by an appellate court. (*People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 335 N.E.2d 448.) However, we believe that if a party requests such a hearing, the trial court is required to hold one.

Having held that the claims for contribution were properly dismissed, we turn next to the question of implied indemnity. As has been indicated, three of the counts in N&W's counterclaim were based on ordinary negligence, apparently an active/passive theory, and three others were based on strict liability. N&W has made no argument in its brief on the ordinary negligence counts. Therefore, this aspect of the indemnity claims is waived under Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)). It follows that the trial court's dismissal of counts II, IV, and V must be affirmed.

■ In our opinion the remaining counts, I, III, and VI, of N&W's counterclaim seeking indemnity on a strict liability basis stand on a

different footing. The *Skinner* decision, and its subsequent codification of the Contribution Among Joint Tortfeasors Act, effectively enervated the usefulness of the former active/passive implied indemnity theory in ordinary negligence cases. This theory was judicially invented to avoid the harsh consequence of the no-contribution rule. Contribution is now sanctioned, and as we have said, the underlying policy is that of encouraging settlements.

Strict liability, on the other hand, while being a related tort, is based on an entirely different policy, that of placing the onus on the one who has placed a defective product in the stream of commerce and reaped the profit therefrom. (*Suvada; Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857; *McCaffrey v. Illinois Central Gulf R.R. Co.* (1979), 71 Ill. App. 3d 42, 388 N.E.2d 1062.) In effectuating this policy, indemnity is still recognized and applied by the courts.

As a consequence of the policy of distributing the economic burden in the most socially desirable manner, the evolution of indemnity in the context of strict liability took a different track from the active/passive theory. "Upstream" indemnity was permitted, even to a manufacturer who incorporated a defective part into his final product. (*Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857.) "Downstream" indemnity was generally prohibited. (*Kossifos v. Louden Machinery Co.* (1974), 22 Ill. App. 3d 587, 317 N.E.2d 749.) The latter rule has been relaxed to the extent of permitting contribution from a plaintiff's employer when it could be shown that the employer misused or assumed the risk of the defective product. (*Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, 374 N.E.2d 455; *Robinson v. International Harvester Co.* (1977), 70 Ill. 2d 47, 374 N.E.2d 458.) Misuse or assumption of risk will also reduce a plaintiff's recovery against a manufacturer of a defective product. *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197.

In the case at bar, N&W alleged that Monsanto placed an unreasonably dangerous product into the stream of commerce by "trip-leasing to Richold Chemical, Inc. a certain tank car" with a defective coupler yoke; that Dresser manufactured the coupler yoke; and that GATX manufactured the car and incorporated the yoke into it. No claim was made against Monsanto that the product it manufactured and placed in the tanker was unreasonably dangerous; the only allegation in this regard was that Monsanto was negligent in its manufacture; and we have already held that the dismissal of the negligence counts was proper.

Clearly these allegations concerned "upstream" indemnity and should not have been dismissed. We do not regard Monsanto's status as lessor as being qualitatively different from a manufacturer.

■ Monsanto and Dresser argue that there can be no indemnity here because of the lack of a pretort relationship, citing the principles enunciated in *Muhlbauer v. Kruzel* (1968), 39 Ill. 2d 226, 234 N.E.2d 790. In that case the plaintiff was injured when a clown was performing in front of the defendant's grocery store. Defendant filed a third-party complaint against Wilson & Co. seeking indemnity and alleging that the clown was hired by Wilson and that Wilson was responsible for his conduct. The supreme court affirmed a dismissal of the third-party complaint, stating that some relationship must be alleged upon which a duty may be predicated. The defendant's effort apparently was an attempt to divorce himself completely from any connection with Wilson. The court noted that if the defendant had alleged that the clown was acting both for himself and for Wilson, it might have been "possible to discern potential relationships that would support a duty on the part of Wilson to indemnify ***." 39 Ill. 2d 226, 232, 234 N.E.2d 790, 793.

*Muhlbauer* recognized the general principle that one person ordinarily will not be held responsible for the conduct of another, absent some relationship. However, it is the nature of indemnity that in a very real sense the indemnitor becomes responsible for the conduct of the indemnitee.

In the instant case, we believe that the pleadings reveal a sufficient pretort relationship to sustain indemnity. N&W was the carrier and in control of the tanker, manufactured by GATX incorporating a part made by Dresser; the cargo belonged to Monsanto. In order to be analogous to *Muhlbauer*, N&W would have to allege that it had absolutely nothing to do with the tanker or its cargo and that the other defendants placed it on N&W tracks and transported it. Obviously this is not the case.

■ GATX argues that the Contribution Among Joint Tortfeasors Act prohibits an action for indemnity. We do not agree. We have already detailed the policies underlying contribution and strict liability and their differences. Settlements are to be encouraged, but more importantly the public is to be protected from defective products. If a manufacturer of a defective product could escape liability via indemnity by making a contribution and then closing his file, that policy would be frustrated. We believe that a good-faith settlement under the Contribution Among Joint Tortfeasors Act does not discharge a manufacturer of a defective product from liability for indemnity based

on strict liability. The same is true of assemblers and lessors. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857.

To summarize, we find that the claims for contribution were properly dismissed; the claims for indemnity based on active/passive ordinary negligence were also properly dismissed; the claims for indemnity based upon strict liability should not have been dismissed, and the trial court committed reversible error in doing so. Upon remand, these will be reinstated.

### CONSOLIDATION OF CASES

As we have previously stated, this litigation consisted of 47 separate lawsuits, consolidated for trial. The 47 plaintiffs were all represented by the same counsel. The motion to consolidate was made by plaintiffs and opposed by N&W. In pertinent part the trial judge's remarks in allowing the motion were:

> "The court having considered all arguments of the parties and memorandums before the Court; the Court also considering on its own motion the multiplicity of jury trials that would be involved if all of said cases were tried separately; the Court further considering that the jury trials, if commenced and followed one case after the other, would take 48 to 60 months of continual trials; this having been represented to the Court by the parties present during the oral arguments concerning the Motions to Consolidate.
>
> The Court being fully advised hereby Orders the above cases consolidated for the purpose of trial and hereby assigns said cases for trial to the Honorable Charles W. Chapman."

Section 2—1006 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1006) provides that actions pending in the same court may be consolidated as an aid to convenience whenever it can be done without prejudice to a substantial right. The question of consolidation is a matter of discretion with the trial court. *Peck v. Peck* (1959), 16 Ill. 2d 268, 157 N.E.2d 249.

We are appreciative of the trial court's apprehension concerning the length of time which individual trials might have consumed. On the other hand, we believe that N&W has suffered substantial prejudice in the consolidation of all 47 cases. We do not wish to be understood as saying that some consolidation might not have been possible under the circumstances. The wholesale approach here constitutes an abuse of discretion.

It will be remembered that there were three separate occasions

upon which various plaintiffs may have suffered physical impairments by exposure to the chemical cargo: (1) at the spill site in Sturgeon; (2) during the clean-up operations at Sturgeon; and (3) during the transportation of the ruptured tanker back to Moberly and its repair there. There is no indication that one plaintiff, or even several, were present during all three occasions. It follows that the operative facts would be different as to most, if not all, of the plaintiffs.

Furthermore, the jury was instructed under four different legal theories. In addition to FELA and the Safety Appliance Act, which have been previously mentioned, instructions were given in two cases on violations of the Boiler Inspection Act (45 U.S.C. sec. 22 (1976)) and in one case on common law negligence. There appeared to be an extremely random selection of the method of submitting the cases to the jury. For example, plaintiff L. Lewis' case, which involved the Boiler Inspection Act, was submitted with two other cases involving the FELA; plaintiff Orr's case, which also involved the Boiler Inspection Act, was submitted with three other cases involving the FELA.

There was an equally random submission of all the cases. Plaintiff Lowe's case was the first submitted; it went to the jury by itself; thereafter, 30 cases in groups of three each were submitted, and then, 16 cases in groups of four each. The time spent by the jury in deliberations implied that they were having difficulty in comprehending the issues. In plaintiff Lowe's case, they deliberated for four hours and then reported that they were hung. The trial judge sent them home and after detaching one of the jurors, as will be more fully explored below, directed them to report back at 10 a.m. the next morning. Thereafter, a jury of 11 reported a verdict in two hours and 38 minutes. The record is incomplete as to deliberation times as to all submissions. However, a sampling will indicate the problem. In the three-plaintiff groups, the high was 4 hours 45 minutes, or an average of 1 hour 35 minutes per plaintiff; the low was 59 minutes, or an average of 20 minutes per plaintiff. In the four-plaintiff groups, the high was 3 hours 40 minutes, or an average of 55 minutes per plaintiff; the low was 10 minutes, or 2.5 minutes per plaintiff. The inconsistency speaks for itself.

Some testimony came into the record which could have confused the jury in dealing with 47 cases simultaneously. The chief contention of all the plaintiffs was that their condition of ill-being resulted from exposure to dioxin. Without getting into all the ramifications of organic chemistry, we can summarize the matter of dioxin as follows. Orthochlorophenol, which was the tanker's cargo, consists of a benzene ring with a hydroxyl atom on one position and a chlorine atom

on the second position. In this condition, it is called monochlorophenol; when a second chlorine atom is added to the ring, it becomes dichlorophenol; with the third chlorine atom, trichlorophenol; with the fourth chlorine atom, tetrachlorophenol, a variant of which is tetrachlorodibenzoparadioxin (TCDD). The term "isomer" denotes a phenol molecule with a certain number of chlorine atoms arranged in a particular manner around its benzene ring. For example, 2,4,5 trichlorophenol refers to the position of the chlorine atoms on the ring. The term "dioxin" is often used in a general sense to refer to phenol molecules containing one or more chlorine atoms. However, it is also invariably used to refer to 2,3,7,8 TCDD, which is the most toxic synthetic chemical known, although more toxic chemicals than it occur naturally.

There were introduced into evidence the results of several tests made on the cargo of the tanker. A chemist for the United States Environmental Protection Agency performed one of the tests to ascertain whether the cargo contained 2,3,7,8 TCDD. His report stated that the cargo of the tanker contained 22 parts per billion "of a component that satisfied the stated analytical criteria for 2,3,7,8 TCDD." A chemist for Monsanto also performed a test and found 40 parts per billion of a tetra level dioxin.

We offer no opinion as to the validity of these tests, but assuming 40 parts per billion of 2,3,7,8 TCDD in the tanker's cargo, which was 19,000 gallons of liquid, the total amount of TCDD would be about four-fifths of a teaspoon. At 22 parts per billion, it would be one-quarter to one-half of a teaspoon.

This leads to the evidentiary question as to how much exposure, and when it took place, there was concerning the 47 plaintiffs.

Plaintiffs' expert, Dr. John Bederka, was presented with a lengthy hypothetical question which contained brief statements of the exposure of 47 hypothetical men and a presumption that a test by the United States Environmental Protection Agency of a reserve sample of the cargo confirmed the presence of 22 parts per billion of 2,3,7,8 TCDD. Bederka was then asked whether "there was sufficient exposure to the toxic materials from the tank car to cause the 47 hypothetical individuals to exhibit adverse signs of systemic *** chemical poisoning." Bederka concluded that there was sufficient exposure.

Bederka was also aksed, "What is the fate of the people exposed?" Bederka answered this question by making reference to animal studies wherein known dosages of 2,3,7,8 TCDD were administered to laboratory monkeys and rats. Bederka assumed, based on the presence of 22 parts per billion of 2,3,7,8 TCDD in the reserve sam-

ple, that one-half to one-quarter teaspoon of 2,3,7,8 TCDD was present in the tank car, that the hypothetical men came into contact with one-tenth teaspoon of the "crude goop," that all of the dioxin in the goop was absorbed into the men's bodies, and that this dosage was given on a daily basis. Bederka concluded that: "At roughly this dose for this period of time one [study] had dead monkeys. At this dose and this period of time you had cancer in almost all of the rats." Bederka also said that because the hypothetical men had been "10 to 10,000 times more exposed than you would like them to be, *** even if they had less than this, one-tenth of them, some of them would probably be affected. And some of them would be very, very sick if they had this kind of exposure.

A significant assumption in Bederka's answer was that each hypothetical man had absorbed all of the dioxin in one-tenth teaspoon of the "crude goop." (Bederka defined the goop as the oily materials in the tank car which in "all likelihood" contained the dioxin.) He stated that the goop was "basically the oily 21% of the mixture with a little bit of phenol and a little bit of chlorophenol in there too. And maybe a little bit of water to make it sort of gel-like product." He stated that probably all of the 2,3,7,8 TCDD was in the "oily goop." At least three plaintiffs, who had worked only at Moberly, never came into contact with any goop. The extent of the exposure of these plaintiffs was that they smelled strong odors from equipment and cars that had been at Sturgeon and they had worked in the vicinity of these items. None testified that his body or clothing came into contact with any chemical which had been contained in the tanker.

The testimony may well have left the impression in the minds of the jurors that all plaintiffs had come in contact with the chemical, especially since Dr. Bederka testified prior to all except four plaintiffs. Consequently, not only was the jury unfamiliar with most of the plaintiffs, they were also uninformed as to the extent of the plaintiffs' exposure.

The potential prejudice in Bederka's testimony was especially significant because (1) it related to the critical issue of whether plaintiffs' exposure to the spilled chemical caused their injuries, and (2) Bederka's testimony was the *only* evidence that plaintiffs had sufficient exposure to 2,3,7,8 TCDD to cause their injuries.

In addition to the kind of evidence presented which could have confused the jury, we find that the manner of presentation of it almost inevitably led to that result.

The plaintiffs' cases came in in a hit-and-miss fashion, apparently dependent on the availability of witnesses from time to time. There

were four chief witnesses in each plaintiff's case: (1) the plaintiff himself; (2) Dr. Bertram Carnow, concerning medical tests and dioxin related injuries; (3) Dr. Leroy Grossman, an economist, concerning lost wages and future medical expenses; and (4) Dr. Samuel Bernstein, a vocational rehabilitation expert, concerning rehabilitation potential. An example of the manner of presentation is shown in the following chart. "Medical" represents testimony by Dr. Carnow; "economist" represents testimony by Dr. Grossman; and "rehab." represents testimony by Dr. Bernstein.

| DATE | WITNESS | |
|------|---------|---|
| April 27 | Plaintiff Lowe | |
| April 28 | Medical, Re: Lowe | |
| | Economist, Re: Lowe | |
| April 29 | Plaintiff Clark | |
| | Economist, Re: Clark | |
| | Rehab., Re: | Lowe |
| | | Clark |
| May 3 | Plaintiff Sumpter | |
| | Plaintiff Buck | |
| | Plaintiff Calvert | |
| | Plaintiff Prior* | |
| May 7 | Medical, Re: Clark | |
| May 10 | Plaintiff Hoffman | |
| | Plaintiff McGee | |
| | Plaintiff Parker | |
| | Plaintiff Brooks | |
| May 11 | Medical, Re: | Sumpter |
| | | Buck |
| | | Calvert |
| May 12 | Economist, Re: | Sumpter |
| | | Buck |
| | | Calvert |
| | | Prior* |
| | | Hoffman |
| | | McGee |
| | | Parker |
| | | Brooks |
| | | Bloss |
| | Rehab., Re: | Sumpter |
| | | Buck |
| | | Calvert |
| | | Prior* |

May 13     Plaintiff Bloss
           Medical Re:     Hoffman
                           Prior*
                           Hoffman
                           Calvert
                           McGee
                           Parker

The difficulty a juror would have in following the presentation of each plaintiff's case is partially illustrated by the testimony relating to plaintiff Prior, which is marked with an asterisk in the foregoing list. The juror would first hear Prior testify on May 3, after three other plaintiffs had testified. On May 7, the juror would hear medical testimony concerning plaintiff Clark and on May 10 would hear testimony by four other plaintiffs. On May 11, medical testimony concerning three other plaintiffs was heard. On May 12, the juror would finally hear the economist testify about Prior's lost wages and future medical expenses. This testimony was combined with the economist's testimony relating to nine other plaintiffs. Also on May 12, the juror would have heard testimony by the vocational rehabilitation expert concerning Prior and four other plaintiffs. Plaintiff Bloss also testified on May 12. On May 13, the juror would have heard the medical testimony relating to Prior. As if it were not difficult enough to keep track of the testimony relating to Prior, the jurors were expected to follow this type of presentation on *46 other plaintiffs*.

A similar, although much less complex, situation was dealt with by the Federal Court of Appeals in *Molever v. Levenson* (4th Cir. 1976), 539 F.2d 996. There the district court had consolidated three actions, one under the Securities Exchange Act of 1934 (15 U.S.C. sec. 78j(b) (1976)), a second being a derivative stockholders' suit, and a third being a defamation action. This was held to be error, the court saying:

> "The effect of the ill-advised consolidation was severely harmful and so serious as to require vacation of the verdicts and reversal of the judgments [in the second action]. Even as ultimately restricted, the proceedings lasted 15 days and absorbed over 4,500 transcribed pages of testimony. In light of such a plenitude of evidence, the jurors would have had to be of uncommonly retentive minds to allocate the proof among the four separate claims." (539 F.2d 996, 1003.)

In the case at bar, 142 days elapsed from opening statements until the last of the verdicts and this portion of the record is represented by over 14,500 transcribed pages.

The only common thread throughout this case is the purported ex-

posure of the plaintiffs to dioxin and the fact that all of the claims grew out of a common accident. But beyond that, there were at least four legal theories of liability; there were at least three occasions upon which exposure could have occurred; there were 47 different possible reactions to exposure; and 47 different possible sets of consequences.

We believe that it was highly unlikely that the verdicts could have been based upon the evidence. The consolidation deprived N&W of a fair and impartial trial and it constituted an abuse of discretion and reversible error.

### DISMISSAL AND SUBSTITUTION OF JURORS

This issue arises from the fact that on motions of the plaintiffs' attorney, made from time to time, the trial court dismissed one alternate and two regular jurors, and seated an alternate after the first verdict had been returned by a jury of 11. All of the dismissals occurred after the jury and the alternates had been selected and sworn. For the sake of clarity, we shall discuss the situations separately.

First, as to alternate juror Schwab: about two months into the trial plaintiffs' counsel moved to dismiss this alternate juror on the ground that she had been talking to the other jurors, apparently in the box during trial, hitting them and making expressions to them. Defense counsel indicated that he had not observed any such conduct, but the trial judge stated that he had seen such actions. He recommended that the attorneys keep watch, and this is apparently what was done during the remainder of the day, which was a Friday. On Monday following, plaintiffs' counsel renewed his motion, pointing out that he had kept count and that Schwab had talked to another juror in the box 21 times during the morning session. The trial judge stated that his notes indicated that he observed her talking on seven occasions. Defense counsel requested that the matter be settled by a general admonition to the entire jury to avoid any such conduct.

During an afternoon recess, the matter was again taken up and the trial judge noted an extended conversation by the juror and an imitation by her of a reflex test being described by a physician on the stand. The trial court concluded that the juror must be dismissed, and he then did so, replacing her with another alternate.

The general principle is that discharge of a juror is a matter of discretion with the trial judge, and prejudice must be shown in order to warrant reversal. (*Snyder v. Poplett* (1981), 98 Ill. App. 3d 359, 424 N.E.2d 396.) We cannot perceive how N&W was prejudiced by the action taken here.

As to the test of discretion, we believe that a trial court must have

some legitimate reason for discharge in order to avoid that appearance of being arbitrary in the face of objections. N&W's counsel did object here. We believe that the trial court's observations, stating it was "patently obvious" that Schwab was annoying the other jurors, give the necessary underpinning of good cause being shown.

As to alternate juror Schwab, the ruling was not an abuse of discretion and hence did not constitute reversible error.

■■■ The second instance is somewhat more complex. In late July, after the trial had commenced on March 15, 1982, plaintiffs' counsel informed the court that he believed a regular juror, Chiarottino, might be guilty of misconduct. He stated that information had come to him through an investigator in his office that the juror had made statements to a friend of the investigator to the effect that the plaintiffs were not seriously injured and that the investigator was responsible for keeping her in court all summer.

The trial judge held a hearing in chambers on the subject. The investigator testified that his wife had told him that a friend, Helen Holder, had told her that the friend's husband, Austin Holder, had visited his mother, Miranda Holder, who said that the juror Chiarottino had discussed the case with her. Hearsay objections by defense counsel were overruled and the investigator further testified that he had interviewed Austin Holder, who told him that Miranda Holder had told Austin that Chiarottino had told her "she wasn't going to be a party to any verdict that was favorable to the men."

The judge then caused Austin Holder and Miranda Holder to be brought in and another hearing was held in chambers. Miranda testified that Chiarottino had told her she was going to vote for the railroad. Miranda was 82 years old and was a neighbor of Chiarottino. The court also listened to testimony from Joan Johnson, a daughter of the Holders, and her husband Greg. Joan had talked with Chiarottino, who told her that she was on jury duty and "there were 47 guys suing the railroad because there was a chemical dumped in Sturgeon, Missouri." There was further conversation about getting off jury duty, but no indication as to how Chiarottino was going to vote.

After the Johnsons' testimony, plaintiffs' counsel moved to discharge the juror. However, the court caused the juror to be brought into chambers to be questioned in the presence of counsel and the following ensued:

"THE COURT: I've got a question, Mrs. Chiarottino. And that is have you had any conversation about this case outside of the courtroom.

MRS. CHIAROTTINO: Well, not any big conversation, I don't

think. I don't know what you mean.

THE COURT: Well, any kind of conversation.

MRS. CHIAROTTINO: I don't think so.

THE COURT: Okay. Could you step outside for just a second."

The court then ruled that the juror was to be discharged. A motion for mistrial by defense counsel was denied.

The jurors here were constantly admonished, and properly so, not to discuss the case. This is always the rule, and its rationale is to allow the juror to base his verdict solely on the evidence presented in open court. Human experience has shown that conversation with outsiders may well lead to extended discussion of the matter, and the consequent voicing of opinions by outsiders, all of which may have some influence, even subliminal, with the juror. However, it is also the rule that "the verdict is not vitiated by a juror's telling a totally disinterested person, pending the trial, of the juror's views with respect to certain evidence in the case, where no efforts were made improperly to influence the juror." 89 C.J.S. *Trial* sec. 457, at 82 (1955).

Even if the hearsay nature of the evidence is ignored, there is nothing in the record here to indicate anything except that the juror had made up her mind in favor of the railroad. Austin Holder also testified that Chiarottino had said that she was not "going along with the rest of the jurors' decision" and she was "going to vote the opposite way of the jurors." There is nothing in the record to indicate that either the Holders or the Johnsons had any part in such a decision.

Undoubtedly, plaintiffs had an interest in dismissing the juror. As a matter of logic, if Chiarottino had prejudged the case, so had the other jurors. One cannot be in opposition to nothing. If the trial judge were correct in dismissing Chiarottino for prejudging, he should also have dismissed the others for the same reason.

We conclude that there was no good cause shown for the discharge of this juror; it was an abuse of discretion and reversible error.

▉ The third instance of discharge occurred after the jury had retired to deliberate their first verdict, that of plaintiff Lowe. After about four hours, the jury reported itself at an impasse and was sent home for the night with instructions to report back the following morning.

On the following morning the trial judge called counsel into chambers and informed them that he had had a communication from juror Grammer at about 7:15 or 7:30 a.m. during which she stated that she could not come to court. She said that she had a problem but could not discuss it, that she was not ill, but that she was upset. The judge convinced Grammer to come in at about 10:15 to 10:30 a.m. Plaintiffs' counsel vehemently stated that the lawyers should not be present when

Grammer was interviewed; defense counsel maintained that it was the right and duty of counsel to be present. Apparently neither the judge nor plaintiffs' counsel desired to inquire into what was upsetting the juror.

Grammer arrived and refused to enter the chambers if a court reporter were present; she had no objection to the presence of the attorneys. Plaintiffs' counsel insisted on the reporter; defense counsel did not. The judge stated that he found Grammer "extremely upset" and indicated that he was going to discharge her. He left to talk to her and returned to state:

> "Let the record show that when I did talk with Mrs. Grammer, just briefly, to describe the physical surroundings, I made arrangements with Judge Calvo to use his chambers. And the lawyers were present and I brought Mrs. Grammer into the antechamber I guess, the bailiff's office there. And she had tears in her eyes and she had her hand over her mouth. And her hand was just shaking. And as I have already indicated, refused to come into the room.
>
> She is obviously, and I cannot other than describe her words, try to describe how upset she is. She is still when I went back out, she still has tears in her eyes. Her hands are shaking. She's got her hand over her mouth as if she is holding back tears.
>
> And I informed her that I was going to excuse her. I apologized to her on behalf of the parties and the Court for the turmoil that the case has apparently caused her. And I instructed her not to discuss the case with anyone. I told her that if she desired when the case was completed I would inform her of the result. This was a matter of courtesy if nothing else. I didn't say that but I thought that a woman that has been here that long and has gone through apparently what this case has done to her. And she violently shook her head, no. And almost started crying again. And she said no, no, no.
>
> ***
>
> I don't like to do this, but I don't think that woman is capable of doing anything. She is not even in enough control of herself to walk into a room because the Court Reporter is here. It's an unfortunate situation. And I hesitate in doing it, but I don't think that there is any other thing that I can do."

We appreciate the delicate position into which the trial court was placed, that of dealing with a semihysterical person, but we believe that it was incumbent upon him to determine at a minimum whether this condition was the result of duress or coercion or whether it grew out of the

deliberative process.

N&W moved for a mistrial upon the dismissal of Grammer and the motion was denied. The deliberations continued with 11 jurors and a verdict was reached about 2½ hours later. On appeal N&W cites two cases for the proposition that the dismissal was improper and prejudicial. *People v. McNeal* (1979), 90 Cal. App. 3d 830, 153 Cal. Rptr. 706, and *People v. Peterson* (1973), 15 Ill. App. 3d 110, 303 N.E.2d 514.

These authorities are not precisely in point since they both involved an issue of the failure to discharge a juror and a question of the juror's impartiality. However, *McNeal* offers some insight into the problem.

*McNeal* cited a prior California case, *People v. Collins* (1976), 17 Cal. 3d 687, 552 P.2d 742, 131 Cal. Rptr. 782, wherein a juror had been dismissed on account of emotional upset. In *Collins* the court said that the juror's statements were sufficient to show good cause for discharge and that "[r]equiring *** that the court demand of the juror the factual basis for her emotional involvement would have added nothing since *she denied that her state of mind was the result of duress or coercion or that it stemmed from the deliberative process.*" (Emphasis added.) (17 Cal. 3d 687, 696, 552 P.2d 742, 748, 131 Cal. Rptr. 782, 788.) The *McNeal* court, in explaining *Collins*, stated, "Once the trial court determined that [the juror] had not been coerced or subjected to duress during deliberations, no further factual inquiry into the basis of her distress was necessary or useful." 90 Cal. App. 3d 830, 839, 153 Cal. Rptr. 706, 709.

The lesson of these authorities is that while the court by observation can determine good cause in the case of an emotionally upset juror, it must go one step further and make a sufficient inquiry to negate any element of coercion or duress. That did not take place in the instant case.

Plaintiffs argue that any suspicion of coercion or duress in this case is pure speculation, and in any event N&W did not request a further *in camera* hearing on the matter. The record does not show that at the time coercion and duress were specifically mentioned, but defense counsel did move for a mistrial for failure to make inquiry as to the reasons why Grammer would not continue. Also, in N&W's post-trial motion it alleged error in discharging Grammer "without the Court's making proper inquiry as to whether she was being pressured, coerced or harassed to vote against her conscience." The subject is properly preserved for review.

We will not be understood as saying that the record supports any intimation of improper conduct by anyone, but the totality of the circumstances is so bizarre and suspicious, we believe that the trial court abused its discretion and committed reversible error in not inquiring into

possible duress or coercion.

■■■ The fourth matter concerning a juror occurred after the dismissal of Grammer. As has been indicated, the jury proceeded to a verdict in the first submission with 11 jurors. The trial judge then indicated that he intended to replace Grammer with one of the alternates who had been separated on the previous day. He stated that he had instructed the alternates to remain available. Objection was lodged by N&W but overruled.

The judge then called an alternate to report to court. He interviewed her and asked if she had discussed the case with anyone. She said she had not, but had heard a radio news report of a $1.5 million settlement; she stated that this would have no effect upon her decision. She was then seated and deliberated throughout the remaining submissions.

The parties have debated at length in their briefs over the meaning and effect of section 2—1106(b) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1106(b)) concerning the seating of alternate jurors. However, no such issue was raised in N&W's post-trial motion, and the point is therefore waived under Supreme Court Rule 366(b)(2)(iii). (87 Ill. 2d R. 366(b)(2)(iii).) *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337.

OTHER MATTERS

As we have indicated, these cases must be retried, although under our holding concerning the forum question we cannot be certain whether those new trials will be in this jurisdiction or elsewhere. In the event they are retried in Illinois, it becomes necessary and proper to comment briefly on some of the evidentiary problems and instructional problems which may arise.

■■■ N&W has complained about the hypothetical question posed by plaintiffs to Dr. John Bederka, one of their experts. Bederka was an associate professor of pharmacology in the Department of Toxicology at the University of Illinois and was the plaintiffs' chief witness as to the toxic effects of dioxin. We have previously alluded to his testimony in connection with our discussion of the consolidation of cases.

The hypothetical question is an evidentiary mechanism beloved by trial lawyers and much relied upon by reviewing courts to extract themselves from difficult manifest-weight-of-the-evidence questions. (Compare *Arcole Midwest Corp. v. Industrial Com.* (1980), 81 Ill. 2d 11, 405 N.E.2d 755.) However, no other procedure is better fitted to make the law look foolish in the eyes of the lay jurors.

In the instant case, the question covers 38 pages of record and the reading of the assumed facts took approximately one hour. N&W ob-

jected to the question in chambers before it was read and moved for a mistrial in the event it was read. The objections were overruled and the motion denied. N&W cites *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301, for its argument that the hypothetical was too long. A careful reading of that case indicates that the supreme court condemned the question, not so much for its length, as for its argumentative nature. No argument is made here that the question was argumentative. N&W also argues that the question made inaccurate assumptions, pointing particularly to the matter of the tests for the presence of 2,3,7,8 TCDD wherein it was stated that a sample showed a substance which "satisfied all the analytical criteria for 2,3,7,8 TCDD." The argument appears to be that circumstantial evidence has no place on a hypothetical question. However, the supreme court has said, "the use of circumstantial evidence is not limited to those instances in which the circumstances support only one logical conclusion. Instead, circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom." *Mort v. Walker* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18, 21.

Numerous other objections are made on appeal to the question, but it would only further burden an already lengthy opinion to pursue them all in detail. We believe that the question, viewed as a whole, while not a model of draftsmanship, does not constitute reversible error. We do recommend that the more sophisticated approach be taken on retrial, *i.e.*, that omitted facts, circumstantial facts, and additional facts, which might change the expert's opinion be explored on cross-examination. See *Spilotro v. Hugi* (1981), 93 Ill. App. 3d 837, 417 N.E.2d 1066; *Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 388 N.E.2d 1298.

The next two evidentiary questions may be considered together. N&W attempted to introduce evidence that others, not parties to the litigation, who had also been exposed to the chemical spill, had suffered no ill effects. Plaintiffs' motion *in limine* to exclude such evidence was allowed by the trial court. Plaintiffs, on the other hand, were permitted to introduce rebuttal evidence of others, not parties to the litigation, who had been exposed to dioxin at certain horse arenas in Missouri; these persons did show ill effects. The dioxin had apparently been present in waste oil which was used at the arenas as a dust suppressant.

Such rulings appear totally inconsistent. A major, if not the principal, issue in the cases was that of causation: whether any possible exposure was the cause of plaintiffs' complaints. As we have already indicated, the presence of the 2,3,7,8 TCDD was based upon circumstantial evidence.

N&W made an offer of proof as to its evidence. It would have consisted of the testimony of 38 employees of Willamette-Western Corporation who participated in the cleanup operations at Sturgeon and who suf-

fered no ill effects therefrom; it would also consist of the testimony of "numerous" other N&W employees who worked side-by-side with the plaintiffs and suffered no conditions of ill-being.

We believe that such evidence was highly relevant to the issue of causation and it was error to bar it. (See *Darrough v. White Motor Co.* (1979), 74 Ill. App. 3d 560, 393 N.E.2d 122.) Plaintiffs' chief objection appears to be that there was no showing that the potential witnesses were similarly situated or had the same reactions as they did. When plaintiffs themselves, consolidated for trial, presented different operative facts and different physical reactions, we fail to see how they can object on that basis.

In *Savage v. Peterson Distributing Co.* (1967), 379 Mich. 197, 150 N.W.2d 804, the Michigan court dealt with a similar case. A mink rancher sued a manufacturer for furnishing contaminated feed which caused the death of the animals. The manufacturer attempted to introduce evidence of lack of complaints from other ranchers. The court held such evidence admissible, saying, "When a product liability cause is presented which depends for connecting links on circumstances presented as here, the defendant has a like right to depend in rebuttal upon opposing circumstances of relevance." 379 Mich. 197, 206-07, 150 N.W.2d 804, 809.

N&W complains about plaintiffs' rebuttal evidence concerning certain horse arenas in Missouri where oil containing 2,3,7,8 TCDD was used to settle dust. There were two sets of witnesses, the Pyatts and the Drinkaerds; plaintiffs' medical expert testified about the Pyatts on direct examination, and N&W's medical expert testified about them in its case in chief, claiming that he had examined them and found no conditions of ill-being. The rebuttal evidence was therefore proper as to them, although it appeared to be more extensive than the ordinary concept of rebuttal. An examination of the record reveals no prior reference to the Drinkaerds. Therefore, no foundation existed for their testimony. Such error will not recur on retrial.

N&W next complains about the trial court's rulings on the depositions of Dr. Kloepfer and Dr. Somers. Kloepfer's original deposition was taken prior to trial concerning tests on soil samples taken from the area of the spill. Objections relating to hearsay and chain of possession were sustained and N&W then sought, in the midst of trial, to take a new deposition of Kloepfer in order to cure the objections. The trial court denied the motion, saying there was no need for everyone to go out to Kansas City (Kloepfer's base of operations) when it all could have been done previously. This was discretionary with the court, although Kloepfer's testimony was important to N&W, and thus the ruling was unfair

to N&W. The trial court appeared to be under the misapprehension that the vital parts of Kleopfer's testimony were already in the record; they were not. However, the difficulty will not recur on retrial.

The Somers deposition presents a moot question. It was quashed by the trial court. At one state of these proceedings the litigation was removed to the Federal District Court for the Southern District of Illinois. The deposition was taken during that period, but not filed in that court prior to remandment to the State court. (See 87 Ill. 2d R. 212(d).) The reason appeared to be that it had not been transcribed.

We need not be drawn into the controversy over whether the deposition was "duly filed" within the meaning of the rule. Clearly it can be retaken prior to retrial.

■■■ N&W next argues that it was deprived of a fair trial by reason of the handling of evidence concerning certain "immunosuppression" tests. Reference to these first appeared during the testimony of plaintiffs' expert medical witness, Dr. Carnow. They appear to be a series of tests performed on blood samples in order to evaluate the body's immune systems. The tests were performed on the plaintiffs and Carnow indicated that each of the plaintiffs showed some abnormality of the immune system, although at another place in his testimony he stated that "we found that over 30 people of these 47 had one or more abnormalities."

Carnow's first general reference to immunosuppression occurred on April 22, 1982; on June 14, 1982, N&W's counsel discovered that he was not in possession of any such test results. He asked Carnow to point out where in N&W's copy of plaintiffs' medical records the tests appeared. Carnow stated that they were not there, having been made after the records were furnished through discovery. He also stated that the tests had been performed under the supervision of Joseph Prince, a doctoral candidate at the University of Illinois. We find in Carnow's testimony at least 47 references to the tests, but there is no objection to any of them by N&W. The matter was first raised in N&W's post-trial motion.

While it is difficult to follow the argument, we believe that at root it claims a discovery violation; *i.e.*, failure to supply copies of the tests and to reveal the name of Prince as an expert.

An examination of the Carnow testimony leads to the conclusion that it was misleading and ambiguous in that it indicated he himself had performed the tests in November 1981, in which case N&W's discovery requests would have covered them. However, this does not excuse N&W from allowing the immunosuppression testimony to continue for a matter of almost two months without making some request at the beginning for supplemental discovery.

A party is under no duty to supplement answers to interrogatories when the party's answers were given in good faith and were complete when made. See *Rogers v. Chicago & North Western Transportation Co.* (1978), 59 Ill. App. 3d 911, 375 N.E.2d 952; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199; *Clay v. McCarthy* (1979), 73 Ill. App. 3d 462, 392 N.E.2d 693; *Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1965), 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd* 1969, 42 Ill. 2d 103, 245 N.E.2d 762.

As is the case with most of these evidentiary questions, it cannot recur on retrial. We are troubled about the potential lulling into misapprehension of counsel by the Carnow testimony, but the failure to object until too late is equally nettlesome.

■■■ The next evidentiary question concerns the use of a computer printout as a basis for testimony. N&W presented Dr. Tamburro from the faculty of the School of Medicine at the University of Louisville. He had examined the plaintiffs' medical records and had developed a statistical analysis to determine whether exposure to toxic chemicals were related to the conditions of ill-being. He testified that he had used a computer programmed to make correlations between plaintiffs; exposure indices, which he had calculated, and their test abnormalities. Plaintiffs objected that the computer program was not in court subject to examination. The objection was sustained tentatively and about two weeks later Tamburro presented the program. Plaintiffs then further objected that the program contained inaccuracies, and this objection was also sustained on the basis (1) that with the presence of inaccuracies, the program was not one in which experts in the field would rely, and (2) it invaded the province of the jury. Tamburro then testified as to certain correlations which he had made manually.

We believe that the trial court committed error in its rulings. Plaintiffs presented no evidence that the computer program was not the type of data upon which experts rely, and in their brief admit that computer generated records can be used as a basis for expert testimony. While it is true that if the data upon which an expert relies contains substantial unreliability or inaccuracy, it may be stricken. (Compare *Manning v. Mock* (1983), 119 Ill. App. 3d 788, 457 N.E.2d 447.) An examination of the record in the instant case reveals that the discrepancies are relatively minor and should have been used as a tool in cross-examination to impeach Tamburro's opinion.

Nor do we believe that the computer printout would invade the province of the jury. The trial court seemed aware of this but held that the jury might give "inordinate weight" to it. Computers have become a fact of legal life and their product is regularly admitted if the foundational

requirements have been met. (*Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238; *Puleo v. Department of Revenue* (1983), 117 Ill. App. 3d 260, 453 N.E.2d 48.) It is the traditional function of the jury to assign weight to items of evidence and that function should not be curtailed nor infringed by a trial court. A court's function is to instruct a jury properly in the use it is to make of admissible evidence, not to exert control over it.

N&W also argues that the computer printout was admissible under the rule of *Grand Liquor*. The record is barren of any attempt by N&W to introduce the document; there is no ruling by the trial court on the matter; and the printout is not included in the record in this court. The argument is moot.

N&W next argues that a ruling by the trial court prevented it from taking the deposition of the bookkeeper for Dr. Carnow, plaintiffs' expert medical witness. The purpose of the deposition apparently was to show how much of the fees paid to Carnow were kept by him and how much paid to other consultants retained by him.

The difficulty with the argument is that nowhere does the record show that the trial court forfended the deposition, nor that N&W sought a ruling on the question. There is some conversation recorded at a pretrial conference stating that there was still pending a ruling on the matter, but nothing more. In the absence of any ruling, there is nothing to review.

There was cross-examination of Carnow himself on the subject of fees, and we find no error in it.

The next ruling which N&W attacks is that on a motion *in limine* made by the plaintiffs to exclude evidence of the manner of transportation used by them in going to Chicago for medical examinations. The trial court allowed the motion. The gist of N&W's argument is that many of the plaintiffs' complaints were subjective in nature. It appears that groups of the plaintiffs were taken together either by plane, or by bus, or by van from their homes to Chicago. N&W argues that by means of conversations during these trips the various plaintiffs could have reinforced their subjective symptoms. This was established by one of N&W's experts, Dr. Robert Cloninger, who testified that plaintiffs' complaints were psychiatric in origin. N&W argues that such fears were reinforced from a similar expression of fears by coworkers.

It is fundamental that a party has a right to present his theories of the case. That right was curtailed by the court's ruling. Evidence of reinforcement was relevant to plaintiffs' complaints and the trial court committed error in its ruling.

N&W's next complaint concerns certain of plaintiffs' exhibits

which were admitted into evidence. These were a number of large charts which purported to display graphically the medical testimony concerning the plaintiffs; for example, plaintiffs' exhibit No. 1037 was seven feet high and five feet wide; it contained 47 vertical columns representing the individual plaintiffs and 85 horizontal rows representing the various tests made upon the plaintiffs. In the squares created by the intersection of the columns and rows, various colored stickers were applied to indicate the result of the test upon the individual plaintiff. N&W argues that the charts were so massive and complex as to confuse and mislead the jurors; furthermore, that they contained inaccuracies and did not represent any conditions which might have existed prior to the chemical spill. It also argues that the charts were only cumulative to the medical testimony and that it had no opportunity to examine them prior to admission.

The use of demonstrative evidence is well-established in the law. (*Department of Public Works & Buildings v. Chicago Title & Trust Co.* (1950), 408 Ill. 41, 95 N.E.2d 903.) Like the hypothetical question, it has become the darling of the trial bar. The use of plastic models and large blow-ups from Gray's Anatomy to illustrate medical testimony has become routine. The advent of color photography and almost unlimited processes of enlargement have added a new dimension to the conduct of trials.

As is the case with so many evidentiary matters, the admission of demonstrative evidence is a matter of discretion with the trial court. That discretion is considerable (*Behles v. Chicago Transit Authority* (1952), 346 Ill. App. 220, 104 N.E.2d 635) and will be disturbed only on a showing of clear abuse. *Bittner v. Wheel Horse Products, Inc.* (1975), 28 Ill. App. 3d 44, 328 N.E.2d 160.

We cannot say as a matter of law that the trial court abused its discretion by admitting the charts. We are constrained to observe that this ruling is scarcely consistent with the ruling on the admission of the computer printouts of Dr. Tamburro. The court there denied admission, saying that he was apprehensive that the jury would "give inordinate weight" to the printout.

■ The final evidentiary matter to be considered is N&W's claim of error in the trial court's ruling on plaintiffs' motion *in limine* to exclude evidence of the failure of the coupler yoke, manufactured by Dresser and incorporated by GATX into the tanker. The trial court ruled that such evidence could not be presented. A stipulation was then entered into in lieu of an offer of proof. In general terms, it indicated that the coupler broke and fell to the track, lifting the tanker off its running gear, which, in turn, punctured the shell of the tanker.

We find that the issue has not been properly preserved for appeal. Plaintiffs' complaints were in two counts, as previously described; count I under the Safety Appliance Act (45 U.S.C. secs. 1 through 43 (1976)) and count II under the FELA (45 U.S.C. secs. 51 through 60 (1976)). Three plaintiffs' cases were submitted to the jury under both counts; the coupler failure could relate only to count I.

The jury returned a general verdict in all cases and N&W did not request any special verdict or special interrogatory. It therefore cannot be ascertained under which count the verdict sounded. We will not presume that it came under a count on which no evidence was presented but rather on a valid count. *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 412 N.E.2d 447; *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.

Two issues of a nonevidentiary nature are next to be considered. First, N&W has raised various objections to the jury instructions. We have considered the instructions as a whole and do not find them defective except in two instances.

The first relates to plaintiffs' instruction No. 27, which was a modification, although not so indicated, of Illinois Pattern Jury Instruction (IPI), Civil, No. 160.07 (2d ed. 1971). That instruction states:

"It was the duty of the railroad to use ordinary care to provide [the plaintiff] [its employees] with reasonably safe and suitable [tools] [machinery and appliances] with which to do [his] [their] work. [Tools] [Machinery and appliances], in order to be reasonably safe and suitable, need not necessarily be the latest or best which could have been provided to do the work."

Plaintiffs replaced "[Tools] [Machinery and appliances]" with "protective equipment." That phrase is too vague, and it is not entirely clear from the record what is meant by it. Plaintiffs presented evidence at trial of the lack of protective clothing, and we assume that was the intent. Protective clothing could be within the ambit of "protective equipment" or "appliances" by stretching it a bit. On retrial this instruction should be more carefully worded, but it does not constitute error here.

The second defect in the instructions relates to plaintiffs' No. 15. This was IPI Civil No. 12.04, which states:

"More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the

defendant, then your verdict should be for the defendant.]"

The "Notes on Use" to IPI Civil No. 12.04 state that, "The second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person."

There was enough evidence in the cases of the involvement of the United States Environmental Protection Agency, Monsanto, Dresser, and GATX to warrant giving the second paragraph of the instruction. Whether the jury would have been persuaded is not the question. All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction. *Wrighthouse v. Brown* (1964), 52 Ill. App. 2d 191, 201 N.E.2d 752.

■ N&W's final contention is that the trial court abused its discretion in denying its counsel a continuance on the morning of trial. It will be remembered from our earlier statements that on that morning Monsanto, Dresser, and GATX announced their settlement with the plaintiffs and were dismissed. N&W's counsel asked for a continuance based upon (1) his lack of sleep the night before; (2) the publicity in the area; and (3) the need to know what each plaintiff was to get out of the settlement. In its post-trial motion N&W alleged that the continuance was necessary to take depositions of physicians and other witnesses who were to have been brought in by the other defendants.

On appeal, N&W has shifted its ground and alleged the continuance was needed because: (1) it was surprised by the settlements; (2) it was relying on Monsanto to take the depositions; and (3) the settlements changed the whole nature of the case because prior thereto its defense was concentrated on its counterclaims.

We do not believe that a party should be permitted to claim one set of reasons at the time of the trial court's ruling, another at its post-trial motion, and yet another on appeal. Such practice has not been countenanced in the areas of admission of evidence and jury instructions. (See *Brumley v. Federal Barge Lines, Inc.* (1979), 78 Ill. App. 3d 799, 396 N.E.2d 1333; *Huff v. Condell Memorial Hospital* (1972), 4 Ill. App. 3d 352, 280 N.E.2d 495; *Migliore v. County of Winnebago* (1974), 24 Ill. App. 3d 799, 321 N.E.2d 476.) The same rationale applies to continuances.

In any event, jury selection was completed on March 17, 1982, and the trial was then adjourned until April 5, 1982, for the purpose of taking depositions. There was no abuse of discretion. However, we see in the action of the trial court a startling insensitivity. The case had taken on new dimensions; counsel was physically worn out; certainly such a situation would normally call for a recess in order to allow all parties and

the court to reassess the case. We trust such abrupt determinations will not occur on retrial.

### MONSANTO'S MOTION

The final matter to be disposed of is a motion by Monsanto to supplement the record in this court with extracts from the record in a related case now pending on the trial level. The allegations of the motion are that N&W has taken a position in the related case directly opposite to that taken in the instant case on the subject of contribution.

We can perceive no assistance to us in our resolution of the question here by taking cognizance of what might have been done in other litigation. No case has a brother.

The motion to supplement was taken with the case and is now denied.

For all the foregoing reasons the judgments of the circuit court of Madison County are reversed. The cause is remanded to that court with directions either to dismiss for refiling in the proper forum on the conditions set forth above, or for a new trial in this jurisdiction in accordance with the views set forth herein.

Reversed and remanded with directions.

MILLS, P.J., and GREEN, J., concur.